736 A.2d 422

Henry FAITH, Individually, etc.

v.

Timothy Lee KEEFER.

No. 1499, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 3, 1999.

708

710

Robert J. Feldman, Towson (Charles Edward Mentzer, Baltimore, on the brief), for appellant.

Lawrence E. Ballantine and Adam Sampson, Towson, for appellee.

Argued before HOLLANDER, THIEME, and PAUL E. ALPERT (Ret., Specially assigned), JJ.

HOLLANDER, Judge.

This appeal arises from a fatal automobile accident that occurred in Washington County on January 17, 1997. Thirty-seven year old Rebecca Faith ("Rebecca" or the "decedent"), a passenger in a vehicle driven by nineteen year old Timothy Lee Keefer ("Keefer"), appellee, was killed when the car collided with a utility pole. On April 15, 1997, a wrongful death and survival action was filed against appellee in the Circuit Court for Washington County by the decedent's husband, Henry Faith ("Henry"), individually and on behalf of the decedent's estate and the couple's daughter, Tricia Nicole, and by Steven Rhyme ("Rhyme"), the ex-husband of the decedent, on behalf of, Daniel Rhyme, the son of Rhyme and the decedent. The plaintiffs below are the appellants here.[1]

After the circuit court granted appellee's Motion for Summary Judgment, appellants timely noted this appeal. They

---

1. Appellants' brief only refers to Henry as appellant, while appellee's brief names both Henry and Rhyme as "Plaintiffs/Appellants." But, the Notice of Appeal is captioned: "PLAINTIFF(S) HENRY FAITH, et al." Moreover, the caption of the complaint names the following persons as Plaintiffs: "HENRY FAITH INDIVIDUALLY AND AS HUSBAND OF REBECCA FAITH AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF REBECCA FAITH AND AS FATHER AND NATURAL GUARDIAN OF TRICIA NICOLE FAITH, INFANT AND STEVEN RHYME AS FATHER AND NATURAL GUARDIAN OF DANIEL RHYME, INFANT C/O CHARLES MENTZER [APPELLANTS' ATTORNEY] . . . ."

present two questions for our consideration, which we have rephrased:

I. Did the circuit court err in denying appellants' Motion in Limine, seeking to exclude appellee's belated answers to interrogatories, filed after Keefer had invoked his privilege under the Fifth Amendment?

II. Did the circuit court err in granting summary judgment in favor of Keefer based on contributory negligence, assumption of the risk, and agency?

For the reasons that follow, we shall uphold the trial court's denial of appellants' motion in limine, but reverse the award of summary judgment in favor of appellee. Accordingly, we shall remand the matter to the circuit court for further proceedings.

### Factual Summary[2]

Shortly before 1:47 a.m. on January 17, 1997, appellee was driving eastbound on Maryland Route 144 (also known as Western Pike), in a 1989 Ford Mustang GT that was co-owned by Rebecca and her husband, Henry. Western Pike is a two lane roadway with a posted speed limit of 40 miles per hour. Two yellow road signs were posted on the approach to a curve in the road, warning of the curve and a maximum speed of 30 miles per hour. As Keefer proceeded around the bend of the curve, at or near the intersection of Round Top Road, he lost control of the vehicle. The car collided with a utility pole, causing the pole to snap in half. Rebecca, the vehicle's only passenger, suffered a crushed chest when the side of the vehicle collapsed.

Kristine Brown was the first person on the scene.[3] She had been heading westbound on Maryland Route 144 when she

---

**2.** Our factual summary is derived largely from the parties' briefs, the police report, the deposition of Deputy Richard Schleigh on May 7, 1998, the deposition of Dr. Howard Weeks on May 7, 1998, and appellee's Answers to Interrogatories.

**3.** The record contains a discrepancy as to the spelling of the witness's name. In the police report, her name is spelled "Kristine Brown." In

saw the Mustang traveling eastbound at an estimated speed of 65 or 70 miles per hour. Moments later, Ms. Brown heard the collision and immediately turned to check on the condition of the people involved in the accident. She promptly called for medical assistance.

Fire and rescue personnel extricated appellee from the vehicle and transported him to Washington County Hospital. Deputy Richard Schleigh of the Washington County Sheriff's Department, who was the first police officer at the scene, testified at his deposition on May 7, 1998, that he was notified of the accident at 1:47 a.m. and arrived at the scene at 2:07 a.m. The deputy stated:

When I first arrived I observed a black Mustang. It had damage to the passenger side where it was—had impacted a utility pole. The driver's seat was empty, the passenger['s] seat still had a female occupant in it who was deceased.

Deputy Schleigh further testified that there was a prominent odor of alcohol in the car and that "[s]everal Busch Lite 32–ounce beer bottles were found on the passenger side floor." The deputy did not recall whether the bottles were open, however. He also reported that a blood sample taken from Keefer at the emergency room revealed that his blood alcohol level measured "0.18 grams of alcohol per 100 millimeters of blood," and that "[d]riving while intoxicated is 0.1" grams of alcohol per 100 millimeters of blood. As to the cause of the accident, the deputy stated:

The primary cause of the accident was the high speed causing ... [appellee] to be unable to negotiate the turn of the curve in the road. Secondary would have been the alcohol concentration. It would have impaired his ability to operate the vehicle properly.

At his deposition on May 7, 1998, Dr. Howard Weeks, a medical examiner, explained that neither a blood analysis nor an autopsy was performed on the decedent, because "the

the transcript of Deputy Scheleigh's deposition, however, her name is spelled "Christine Brown".

crushing injury [to Rebecca's] chest wall" was the obvious cause of death. In addition, Dr. Weeks opined that, based on the "severity of [the] crushed chest," the decedent did not suffer any conscious pain and suffering as a result of the collision; death "occurred instantly upon impact."

As a result of the collision, appellee was criminally charged with homicide by motor vehicle while intoxicated, homicide by motor vehicle while under the influence of alcohol, driving while intoxicated, negligent driving, and driving at an unreasonable speed. Those charges were pending during much of the discovery phase of the civil suit, and were not resolved until April 1998.

On July 21, 1997, appellants' counsel had written to appellee's counsel, stating: "Enclosed is a complete set of pleadings filed in the above matter. When you deem it appropriate, please answer the pleadings[.]" In his brief, appellee claims that the "pleadings" included Interrogatories, a Request for Admissions of Fact, and a Request for Production of Documents. On August 7, 1997, appellee filed a Certificate Regarding Discovery, indicating that he served on appellants' counsel a Response to the Request for Admissions of Fact and Request for Production of Documents. Subsequently, on November 14, 1997, the circuit court issued a scheduling order requiring completion of all discovery by May 15, 1998.

Appellee was deposed on February 16, 1998. At the outset of the deposition, Keefer's lawyer noted that he had advised appellants' counsel that Keefer intended to invoke his Fifth Amendment privilege because of the criminal charges pending against him. His counsel further noted that, upon the conclusion of the criminal matter, Keefer would be available to answer any questions concerning the collision. Keefer's attorney said:

I was advised by Mr. Beasley [the attorney representing Keefer in his criminal case] that the criminal trial is scheduled for April of this year, and prior to the criminal trial going forward he was not going to permit Mr. Keefer to answer any questions which might violate his Fifth Amend-

ment right of self incrimination because of the pending criminal trial.

Last week I spoke to [appellants' counsel] and advised him that today's deposition might be very short and fruitless because of Mr. Beasley's concerns, and asked if we could postpone it. [Appellants' counsel] ... said that he would prefer to move forward.

I note that the scheduling order in this matter indicates that discovery cutoff is not until mid-May. Mr. Beasley has advised me that after Mr. Keefer's criminal trial in April [1998] he will permit Mr. Keefer to answer any questions that [appellants] may have with regard to the accident of January 17, 1997.

I explained this to [appellants' counsel], and it was his indication that he preferred to go forward with today's deposition. . . .

Accordingly, Keefer answered only a few questions. He testified that the "last two or three weeks that she was alive," Rebecca lived in a boarding house in Hancock, Maryland, where he also resided. Keefer also said that he had only known the decedent for "[a] couple of weeks," and acknowledged that they had been involved in a sexual relationship. Thereafter, appellee asserted his Fifth Amendment privilege each time he was questioned about the collision.

Henry was also deposed on February 16, 1998. He averred that for the two weeks prior to the collision, Rebecca lived at home with him from Monday through Thursday, but on the weekends she resided in an apartment in Hancock, "to get her head straight." Henry also testified that Rebecca had been treated for a drinking problem "during the summer" before the accident. Apparently, the decedent was required to undergo treatment due to "an alcohol conviction for driving."

According to Keefer, in April 1998 he "pled guilty to homicide by motor vehicle while intoxicated as a result of criminal charges brought against [him] for the accident which gave rise to the lawsuit." Thereafter, in correspondence dated May 19, 1998, appellee's counsel reiterated to appellants' counsel that

Keefer was available for deposition. The letter stated, in pertinent part:

> Prior to the start of Mr. Keefer's deposition, I advised you that [Keefer's criminal attorney would not permit him to answer certain questions] ... based on the [p]endency of his criminal trial which was scheduled for April of this year. As you know, Mr. Keefer pled guilty in that matter and was sentenced.

> Pursuant to the agreement placed on the record, Mr. Keefer is now available to answer any questions by way of deposition and I expect to have his signature on the enclosed Answers to Interrogatories in the next several days.

> * * *

> I also advised you that I would be preparing a Motion for Summary Judgment. I will probably include, in that Motion, the assumption of risk argument based on the information in Mr. Keefer's Answers to Interrogatories with respect to Ms. Faith's purchase of the alcohol that he drank that evening. . . .

Appellants opted not to re-depose Keefer. In their brief, appellants assert that appellee's "11[th] hour offer [to re-depose Keefer] was at [appellants'] expense, and was extremely late in [their] preparation for trial."

Appellee filed his "Answers to Interrogatories" (the "Answers") on May 19, 1998, four days after the discovery deadline established by the scheduling order. Although the Answers were provided nearly ten months after they had been served, and shortly after the May 15, 1998 discovery deadline, appellants had never moved for sanctions or to compel discovery pursuant to Md. Rule 2–432.

In the Answers, appellee recounted the events that led to the collision. He said:

> I cannot remember everything I had done in the twenty-four hour period before this occurrence. However, to the best of my recollection, on the evening before this occur-

rence [January 15, 1997], I had spent most of the evening drinking beer with Rebecca Faith in her room at the boarding house where we lived. I next saw the decedent, Ms. Faith, the following evening [January 16, 1997] at approximately 9:00 p.m. She picked me up on the street in Hancock, Maryland and we went to the Dead End Liquor Store, where she purchased a pint and a half of whiskey and a twelve pack of beer. We drove around Hancock and finished the whiskey and the beer. Ms. Faith then drove back to the Dead End Liquor Store where she purchased another half pint of whiskey, which we drank in the bank parking lot in Hancock. . . .

We then drove to Shoenagles [a bar] in Little Orleans, Maryland. While there, we continued to drink whiskey and beer until we left Shoenagles at approximately 1:00 a.m. We were returning to our rooming house in Hancock when the accident occurred.

In addition, Keefer claimed that although Rebecca knew he was under the legal drinking age, she purchased alcohol for him. He also asserted that, despite knowing he was intoxicated, Rebecca insisted that Keefer drive home. Appellee stated: "As [he and the decedent] were leaving Shoenagles [Rebecca] took the keys to her vehicle, threw them on the ground and told [Keefer], 'You drive, you're driving me home.' "

On June 5, 1998, appellee moved for summary judgment. Keefer argued that, under the doctrine of imputed negligence, Rebecca, as the passenger and owner of the vehicle, was presumed to have consented to appellee's negligent operation of the vehicle. Appellee also claimed that, because Rebecca gave him the keys to the vehicle and asked him to drive home, he was acting as her agent. Therefore, under the doctrine of respondeat superior, he contended that appellee's negligence was imputed to the decedent, thereby barring appellants' recovery. Additionally, Keefer asserted that appellants' claims failed based on the doctrines of contributory negligence and assumption of risk. Keefer's position was predicated on his contention that Rebecca had asked him to drive "with full knowledge that he was not old enough to drink, but had been

drinking with her, alcohol which she had purchased for him for several hours prior to her giving him the keys."

On June 23, 1998, appellants filed a "Motion in Limine to Preclude Testimony of the Defendant as to the Occurrence." In their motion, appellants noted that at Keefer's deposition on February 16, 1998, Keefer "invoked his Fifth Amendment privilege on several occasions each of which was in response to questions about events taking place on the day of the accident." Although appellants acknowledged that Keefer had an absolute right to invoke the privilege in response to their questions, they argued that, by doing so, Keefer was "preclude[d] . . . from testifying on that particular subject matter in any future proceeding. . . ."

Appellants also opposed appellee's summary judgment motion. They argued, *inter alia*, that appellee "launched a three prong attack against [their] right to a trial . . . based upon facts that can not be put into evidence by [appellee] as he can not now 'testify' as to any of the facts, particularly as now set forth in his late responses to discovery."

In opposing appellants' motion in limine, Keefer argued that he had not thwarted the discovery process by invoking his Fifth Amendment privilege. He claimed that, at his deposition, appellants knew that he intended to invoke his Fifth Amendment privilege because of the criminal charges then pending against him. Moreover, Keefer noted that his counsel had suggested postponement of the deposition until after the criminal trial, which was then scheduled for April 1998, but appellants chose to proceed. Additionally, Keefer claimed that, following the criminal proceedings, he offered to resume his deposition.

Following a hearing on July 6, 1998, the circuit court denied appellants' motion in limine and granted summary judgment in favor of appellee. As to the motion in limine, the trial court stated:

> While at the time of the deposition, criminal charges were pending, the court took the plea in the criminal charges in this case in April of this year, uh, discovery apparently

ended in mid-May, so there was time to take another deposition and that's been, apparently, admitted by counsel here that there was discussions concerning depositions. [Appellants], however, elected not to take advantage of that opportunity because [they] felt, uh, under the law, that . . . once he's invoked his Fifth Amendment rights he cannot come forth and testify later. So, apparently there was repeated offers to have another deposition taken, but for reasons stated, [appellants] did not exercise . . . [their] right to do so. Now, as 1 indicated at the beginning of the deposition transcript, itself, it appears that a discussion did take place indicative of Keefer's desire to invoke the Fifth Amendment at that time, but to be deposed after the plea bargain, which apparently took place in April. I, you know, I think since [appellants were] aware of this situation, and knew the situation [they were] given the opportunity to depose [appellee] again, uh, even though [they] desired to take the initial deposition knowing that the Fifth Amendment privilege was gonna be invoked, and I assume that was for trial tactic purposes, the point is [they have] not done so. This is moot anyway because even though it's after discovery guidelines, deadline, [appellee] did file answers to interrogatories which were attached to the motion for summary judgment. And, of course, in those answers, it discussed the incident and events leading up to it, including the intoxication and the deceased's actions in allegedly getting [appellee] to operate the motor vehicle when the unfortunate accident occurred. Even though the answers to the interrogatories were filed after the discovery deadline, you know, absent any showing of prejudice to [appellants] because of lateness, 1 feel [appellee] could testify about the [content] of the interrogatories.

With respect to summary judgment, the court said:

We have an unfortunate situation. It's obvious to the court that the decedent was, at [the time of the collision], estranged from her family, was living in a boarding house where [appellee] also resided. Without getting into the relationship between the decedent and [Keefer], it is uncontradicted that on the day in question . . . copious amounts of

alcohol were consumed during the afternoon and evening hours, and that the alcohol was provided by the ... decedent.... And as contained in the answers to interrogatories, which have ... not been disputed, and as I said, credibility of the witnesses is not before me at this time, ... the two individuals then went to [a bar in] Little Orleans.... And unfortunately ... additional alcohol was consumed.... The car is owned by the decedent. [Keefer] has the car keys, this court can reasonably infer were given to him by the decedent, and was instructed to drive home. Unfortunately, this tragic accident occurs on the way home. Concerning whether or not there could be, at the time of trial, introduction of ... whether or not [Keefer] was intoxicated at the time, I think it can reasonably be inferred that people that drink during the afternoon and drink all night, that there's certainly a problem with their ability to operate a motor vehicle. But also I think there's an indication in here that [there would be] testimony concerning a high rate of speed.... [T]he burden of proof, at least for the judgment purposes, or motion purposes, has been met under the agency theory and, also, contributory negligence and assumption of risk.

We shall include additional facts in our discussion.

## Discussion

### I. The Motion in Limine

█ In their challenge to the trial court's denial of their motion in limine, appellants maintain that once Keefer invoked his Fifth Amendment privilege at the deposition, he was forever precluded from testifying about the events of January 17, 1997. Appellants also claim that the Answers should have been excluded because they were not filed within the time provided by the May 15, 1998, discovery deadline or within the time provided by Md. Rule 2-421.[4] We shall address these arguments *seriatim*.

---

4. Appellants' timeliness argument appears in the body of their brief in one sentence. They state that the court erred when it "failed to exclude

Appellants maintain that the Answers should have been excluded because Keefer used his Fifth Amendment privilege as a shield to hinder appellants' preparation for trial and then as a sword to obtain judgment in his favor. To support their contention, appellants rely on *Kramer v. Levitt,* 79 Md.App. 575, 558 A.2d 760, *cert. denied,* 317 Md. 510, 564 A.2d 1182 (1989). There, Levitt and Kramer entered into a business arrangement, in which Levitt agreed to lend money to certain borrowers, and Kramer and his partner would act as loan brokers, collecting monthly payments, deducting their fee, and remitting the balance to Levitt. *Kramer,* 79 Md.App. at 577, 558 A.2d 760. The loans were secured by deeds of trust in which either or both of the brokers were named as trustees. *Id.* In September 1983, the brokers advised Levitt that they had misappropriated certain funds because of an unexpected reversal of fortune. *Id.* Thereafter, Levitt discovered that all of the borrowers had repaid their loans and all of the repaid monies had been misappropriated by the brokers. *Id.*

Levitt filed suit against both Kramer and his partner, but the latter failed to plead and a default judgment was entered against him. *Id.* at 578, 558 A.2d 760. During the discovery phase, Kramer objected to Levitt's request for admissions, interrogatories, and document requests, on the ground that a response would "violate his constitutional rights, including those under the Self–Incrimination Clause of the Fifth Amendment to the Constitution of the United States and Article 22 of the Maryland Declaration of Rights."[5] *Id.* at

Keefer's Answers *which were submitted after the discovery deadline* and subsequent to Keefer's refusal to answer questions at a properly noted deposition." (Emphasis added). Their remaining discussion concerning the untimeliness of Keefer's Answers is set forth in several footnotes. Although appellants do not clearly articulate that the Answers should have been excluded because they were not filed within the thirty days provided by Md. Rule 2–421(b), we shall assume that this argument is included within the scope of their timeliness argument.

**5.** The Court of Appeals has recognized that Article 22 of the Maryland Declaration of Rights is in *pari materia* with the Fifth Amendment privilege against self-incrimination. *See Richardson v. State,* 285 Md.

579, 558 A.2d 760 (footnote omitted). Levitt moved to compel discovery, but the court denied the motion. *Id.* At trial, Levitt moved in limine, seeking to prevent Kramer from calling any witnesses to testify about the transactions that Kramer refused to discuss in the discovery requests. *Id.* at 582, 558 A.2d 760. After the trial court granted the motion, Kramer appealed.

In upholding the trial court, we noted that "the Fifth Amendment privilege against self-incrimination has long been held to be properly asserted by parties or witnesses in civil proceedings," *id.*, and that it "applies not only at trial, but at the discovery stage as well." *Id.* At the time of discovery, Kramer was "not under indictment or faced with a criminal prosecution or disciplinary action, [but] he could reasonably fear that the information gained from his admissions might furnish a basis for such charges." *Id.* at 583, 558 A.2d 760 (footnotes omitted). Nevertheless, we recognized that " 'if a party is free to shield himself with the privilege during discovery, while having the full benefit of his testimony at trial, the whole process of discovery could be seriously hampered.' " *Id.* at 587, 558 A.2d 760 (quoting 8 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2018 Supp. at 63 (1970, 1988 Supp.)(footnote omitted)). Moreover, we recognized that "when a defendant in a civil action pleads his privilege against self-incrimination in response to discovery requests, he is prohibited from testifying at trial on matters pertaining to those requests." *Id.* at 588, 558 A.2d 760 (citations omitted). Accordingly, we concluded that although a party may assert his privilege, he may not *"use this privilege as a means to hide witnesses [or other relevant evidence] until trial."* *Id.* at 589, 558 A.2d 760 (emphasis added).

Nevertheless, *Kramer* did not countenance, as appellants urge, that whenever a party invokes his Fifth Amendment privilege, he or she is *forever precluded* from giving testimony in any form about the previously undisclosed matter. The

---

261, 265, 401 A.2d 1021 (1979). Article 22 states: "That no man ought to be compelled to give evidence against himself in a criminal case."

concern in *Kramer* was about someone who had invoked the privilege, thereby thwarting discovery of relevant facts, and who then sought to rely on those undisclosed facts at trial. Those concerns are not present here. Unlike the defendant in *Kramer*, appellee did not assert his privilege in order to conceal facts until trial. Instead, he sought a relatively brief delay in discovery, until resolution of his pending criminal charges. Keefer advised appellants of his intent to assert the privilege for a limited period of time, and offered to resume his deposition when the criminal charges were resolved. Once the criminal charges were resolved, which was in advance of trial, appellee furnished the Answers. Significantly, appellants do not complain that, during the period when appellee relied on his Fifth Amendment privilege, important evidence or discovery opportunities were forever lost.

Several of the cases that appellants cite in their brief support our view that appellee's invocation at his deposition of his Fifth Amendment right did not strip the court of its discretion to consider the content of his Answers in connection with the summary judgment motion. For example, in *Federal Trade Comm'n v. Sharp*, 782 F.Supp. 1445 (D.Nev.1991), the court permitted the defendant to submit an affidavit in response to the FTC's motion for summary judgment, although the defendant had previously invoked his Fifth Amendment privilege and refused to answer deposition questions relating to his knowledge of alleged misrepresentations. The court found that the defendant's use of the privilege was not " 'strategic' ", *id.* at 1452, because, at the time of the deposition, the defendant was under indictment. *Id.* As the indictment was later dismissed, the court reasoned that "it was not surprising that [the defendant did] not feel the same compulsion to assert his [F]ifth [A]mendment privilege at this time." *Id.* Moreover, the court found that the FTC was not prejudiced when the defendant invoked his Fifth Amendment privilege, because the FTC was able to obtain relevant information elsewhere. *See also Federal Trade Comm'n v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1290 (D.Minn.1985) (permitting testimony of a

defendant who previously refused to answer deposition questions based on his Fifth Amendment privilege).

The case of *In re John Edmond,* 934 F.2d 1304 (4th Cir.1991), on which appellants rely, is distinguishable from the facts attendant here. In that case, the bankruptcy court refused to allow use of an affidavit offered by the defendant after he refused to submit to a deposition. The controversy arose when the Consumer Protection Division, Office of the Attorney General for the State of Maryland, (the "Division") brought an administrative action against the defendant. After the hearing officer determined that the defendant violated certain provisions of the Consumer Protection Act, the defendant filed for bankruptcy, and the Division filed an action in the bankruptcy court to forestall discharge. Thereafter, the defendant moved for summary judgment, offering his own affidavit in support of the motion. The Division objected, contending that the defendant had invoked "his Fifth Amendment privilege throughout discovery frustrating the mounting of a solid defense to the summary judgment motion." *Id.* at 1306.

The Fourth Circuit concluded that the defendant's refusal to consent to a deposition justified the bankruptcy court's decision to strike the affidavit. *Id.* at 1309. It reasoned:

By selectively asserting the Fifth Amendment privilege ... the defendant attempted to insure that his unquestioned, unverified affidavit would be the only version. But the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion.

*Id.* at 1308.

In marked contrast to the defendant in *In re John Edmond,* Keefer offered to resume his deposition. By refusing to do so, appellants insured that the Answers were the only account of the collision. They may not be heard to complain about a situation they helped to create.

The case of *Securities & Exch. Comm'n v. Zimmerman*, 854 F.Supp. 896, 898 (N.D.Ga.1993), is also inapposite. There, the defendant invoked his Fifth Amendment privilege against self-incrimination with respect to the SEC's discovery. The SEC moved to compel the defendant to waive his privilege, or, alternatively, to exclude the defendant's use of the information he withheld. *Id.* at 898. The defendant, who had not been indicted, argued that "depending on the outcome of the criminal investigation, he may waive his privilege and testify." *Id.* at 898–99. The defendant also suggested that if he decided to testify, he would "make himself available for deposition and [would] respond to discovery requests to which he had previously asserted his Fifth Amendment privilege." *Id.* at 899.

The court recognized that "The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions [after discovery is over]." *Id.* at 899 (citing *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982) and *In re Edmond*, 934 F.2d at 1308). It observed that the defendant "waited until after the SEC ... filed a motion for summary judgment to make his decision as to whether to stay silent or not." *Id.* Because discovery had been completed, the court concluded that the defendant had chosen silence. Consequently, it held that the defendant could not use "any evidence which he ... withheld by his invocation of his testimonial privilege in this matter." *Id.*

Unlike in this case, the defendant in *Zimmerman* had not yet been indicted when discovery ensued. Thus, there was no way to know how long the defendant there would remain silent, or even if he would ever waive the privilege. Conversely, in the case *sub judice*, appellee made it clear at his deposition in February 1998 that he intended to rely on his privilege only during the pendency of the criminal charges. Moreover, any delay would have been brief, as the criminal trial was set for April 1998.

In sum, we are not persuaded that the discovery process was " 'seriously hampered.' " *Kramer*, 79 Md.App. at 587, 558

A.2d 760 (quoting 8 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2018 Supp. at 63 (1970, 1988 Supp.)(footnote omitted)). Therefore, we are satisfied that the trial court did not err or abuse its discretion in denying the motion in limine.

█ We turn to consider appellants' second contention with respect to the motion in limine. We begin our analysis of the timeliness issue with a review of the applicable discovery rules.

Maryland Rule 2–401 provides, in pertinent part:

(b) *Sequence and timing of discovery.* ... The court may at any time order that discovery be completed by a specified date or time, which shall be a reasonable time after the action is at issue.

\* \* \*

(d) *Discovery material.*

\* \* \*

(2) Not to be filed with the court. Except as otherwise provided in these rules or by order of the court, discovery material shall not be filed with the court. Instead, the party generating the discovery material shall serve the discovery material on all other parties and shall file with the court a notice stating (A) the type of discovery material served, (B) the date and manner of service, and (C) the party or person served....

Md. Rule 2–421(b) states:

*Response.* The party to whom the interrogatories are directed shall serve a response within 30 days after service of the interrogatories or within 15 days after the date on which that party's initial pleading or motion is required, whichever is later....

Md. Rule 2–432 provides, in relevant part:

(a) *Immediate sanctions for certain failures of discovery.* A discovering party may move for sanctions under Rule 2–

433(a), without first obtaining an order compelling discovery under section (b) of this Rule, if a party . . . fails to serve a response to interrogatories under Rule 2–421. . . .

(b) *For order compelling discovery.* A discovering party, upon reasonable notice to other parties and all persons affected, may move for an order compelling discovery if (1) there is a failure of discovery as described in section (a) of this Rule,

\* \* \*

(4) a party fails to answer an interrogatory submitted under Rule 2–421,

\* \* \*

(d) *Time for filing.* A motion for an order compelling discovery or for sanctions shall be filed with reasonable promptness.

Maryland Rule 2–433 provides, *inter alia:*

(a) *For certain failures of discovery.* Upon a motion filed under Rule 2–432(a), the court, if it finds a failure of discovery, may enter such orders in regard to the failure as are just, *including one or more of the following:*

\* \* \*

(2) An order refusing to allow the failing party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters into evidence; or

(3) An order striking out pleadings or parts thereof, or staying further proceedings until the discovery is provided. . . .

\* \* \*

(b) *For failure to comply with order compelling discovery.* If a person fails to obey an order compelling discovery, the court, upon a motion of a party and reasonable notice to other parties and all persons affected, may enter such

orders in regard to the failure as are just, including one or more of the orders set forth in section (a) of this Rule....

Md. Rule 2–504(b)(1)(D) states:

(b) *Contents of scheduling order.* (1) Required. A scheduling order shall contain:

* * *

(D) a date by which all discovery must be completed;

The docket entries indicate that appellants never filed a Certificate of Discovery reflecting their request for discovery materials, as required by Md. Rule 2–401(d). Nevertheless, appellee concedes that he received interrogatories from appellants on July 21, 1997. Therefore, pursuant to Md. Rule 2–421(b), appellee should have responded to the interrogatories thirty days after service. As we noted, appellant's counsel initially told appellee to respond "when you deem it appropriate...."

Appellee provided his Answers on May 19, 1998, which was about ten months after the responses were due, and four days after the discovery deadline set forth in the scheduling order. Keefer maintains that he could not respond to the interrogatories until after resolution of the criminal charges, because the Answers "would have served as incriminating evidence...." Appellee did not apply for a protective order under Md. Rule 2–403. Nevertheless, if appellants were unhappy with the delay in receipt of the Answers, they took no steps to obtain them. Notwithstanding appellee's failure to respond to the interrogatories within the time prescribed by Md. Rule 2–421(b), appellants never moved for sanctions or to compel discovery under Md. Rule 2–432(a), (b).

Moreover, in their motion in limine, appellants never complained about the untimeliness of the Answers, nor did they rely upon the untimeliness as a ground to bar use of the Answers. Rather, appellants argued only that the Answers should have been excluded because they concerned matters to which Keefer, at his deposition, had invoked his Fifth Amend-

ment privilege. Instead, appellants first raised the untimeliness issue in their response to appellee's summary judgment motion. There, they referred to the lateness issue as a "collateral fact." Specifically, they stated:

> Interestingly enough is the collateral fact that the Defendant [Keefer] has now also exposed himself to additional criminal charges by filing late Answers to discovery that constitute a judicial admission to previously uncharged crimes (all discovery was due before May 15, 1998, and was obviously intentionally withheld until after the criminal trial).

Similarly, at the motions hearing, appellants' counsel essentially mentioned the untimeliness of the Answers as an aside. The following exchange is relevant:

> [APPELLANTS' COUNSEL]: Accordingly, any evidence that ... [Keefer] would want to present at the time of trial would be precluded. He had ample opportunity to present it at the time of the deposition, the fact that he chose to plead the Fifth is his problem ... and not ours. *Plus we're well beyond the discovery deadline in this case.* ...

> THE COURT: Well the problem I've got ... is the fact that, okay we're beyond discovery deadline, but the answers to interrogatories were, in fact, filed.

> [APPELLANTS' COUNSEL]: I understand that, your Honor, but I think the discovery deadline, that not only even object [sic] to them if they're filed after the discovery deadline, I'm gonna have to object to them and have them stricken out in the particular instance. As I understand it ... those discovery deadlines are basically written in stone. If they're not filed within that time, uh, they don't count. I don't have to take any action at all. *But I don't know that that's really relevant anyway* ....

(Emphasis added). Thereafter, appellants' counsel continued with his Fifth Amendment argument.

Appellants now suggest that, although they never pursued any remedy under the discovery rules, the court erred in failing to exclude the Answers as a sanction for appellee's

untimeliness. Although the trial court recognized that the Answers were untimely, it determined that appellants were not prejudiced. We are satisfied that the court neither erred nor abused its discretion by declining to bar appellee's use of the Answers.

"Maryland law is well settled that a trial court has broad discretion to fashion a remedy based on a party's failure to abide by the rules of discovery." *Bartholomee v. Casey*, 103 Md.App. 34, 48, 651 A.2d 908 (1994), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995); *see* Md. Rule 2–433(a); *Broadwater v. Arch*, 267 Md. 329, 336, 297 A.2d 671 (1972)(recognizing that a court can impose sanctions *"sua sponte* within the framework of the discovery rules"); *Warehime v. Dell*, 124 Md.App. 31, 43, 720 A.2d 1196 (1998); *Heineman v. Bright*, 124 Md. App. 1, 7, 720 A.2d 1182 (1998); *Beck v. Beck*, 112 Md.App. 197, 209, 684 A.2d 878, *cert. denied*, 344 Md. 717, 690 A.2d 523 (1996), *and cert. denied*, 345 Md. 456, 693 A.2d 354 (1997). In exercising its discretion, the trial court should consider several factors, including

> whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the desirability of a continuance. . . .

*Taliaferro v. State*, 295 Md. 376, 390–91, 456 A.2d 29, *cert. denied*, 461 U.S. 948, 103 S.Ct. 2114, 77 L.Ed.2d 1307 (1983); *see also Warehime*, 124 Md.App. at 45, 720 A.2d 1196; *Shelton v. Kirson*, 119 Md.App. 325, 331, 705 A.2d 25, *cert. denied*, 349 Md. 236, 707 A.2d 1329 (1998).

The purpose of Md. Rule 2–504, which pertains to a scheduling order, is "two fold: to maximize judicial efficiency and minimize judicial inefficiency." *Naughton v. Bankier*, 114 Md.App. 641, 653, 691 A.2d 712 (1997). In *Naughton*, 114 Md.App. at 653, 691 A.2d 712, we explained:

> Though such [scheduling] orders are generally not unyieldingly rigid as extraordinary circumstances which warrant modification do occur, they serve to light the way down the

corridors which pending cases will proceed. Indeed, while absolute compliance with scheduling orders is not always feasible from a practical standpoint, we think it quite reasonable for Maryland courts to demand at least substantial compliance, or, *at the barest minimum*, a good faith and earnest effort toward compliance.

■ When a trial court permits a party to deviate from a scheduling order without a showing of good cause, such action by the trial court would be "on its face, prejudicial and fundamentally unfair to opposing parties, and would further contravene the very aims supporting the inception of Rule 2–504 by decreasing the value of scheduling orders to the paper upon which they are printed." *Id.* at 654, 691 A.2d 712. Here, there was evidence of good cause, and no evidence of contumacious behavior on the part of appellee. To the contrary, appellants' correspondence of July 21, 1997, effectively invited appellee to respond at his convenience. Further, through counsel, appellee made clear that he had to wait until after disposition of his criminal case before furnishing certain discovery. Appellee's counsel offered to resume Keefer's deposition as soon as the criminal case was over, but appellants declined to do so. Indeed, even at the summary judgment hearing, appellee's counsel stated:

> Your Honor, I'm ready to go forward based on the evidence that's on the record, but if . . . [appellants' counsel] wants the opportunity to depose . . . [Keefer] I'm . . . [willing] to postpone summary judgment in order to give him every opportunity to cross examine this man on what went on that evening [January 17, 1997].

Appellants' counsel reiterated his refusal to re-depose Keefer.

In our view, appellants' objection to the untimeliness of the Answers was too little, too late. Their complaints lack merit.

## II. Motion for Summary Judgment

### A. Standard of Review

Pursuant to Md. Rule 2–501(e), summary judgment is appropriate only if there is no dispute of material fact and the party in whose favor judgment is entered is entitled to judg-

ment as a matter of law. *See Murphy v. Merzbacher*, 346 Md. 525, 531, 697 A.2d 861 (1996); *Bowen v. Smith*, 342 Md. 449, 454, 677 A.2d 81 (1996); *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 68, 642 A.2d 180 (1993); *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 572, 723 A.2d 502, *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999). A material fact is one that will alter the outcome of the case, depending upon the factfinder's resolution of the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *McGraw*, 124 Md.App. at 573, 723 A.2d 502.

To generate a material factual dispute, the evidence adduced by the non-moving party must be more than "mere general allegations which do not show facts in detail and with precision." *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993); *see Goodwich v. Sinai Hosp.*, 343 Md. 185, 207, 680 A.2d 1067 (1996). In determining whether there is a genuine factual dispute, the trial court must view the facts in the light most favorable to the non-moving party and construe all inferences reasonably drawn therefrom in favor of that party. *See Beatty*, 330 Md. at 739, 625 A.2d 1005; *McGraw*, 124 Md.App. at 573, 723 A.2d 502; *Himelfarb v. Hartford Fire Ins. Co.*, 123 Md.App. 456, 462, 718 A.2d 693 (1998), *cert. granted*, 352 Md. 398, 722 A.2d 885 (1999). Furthermore, if the evidence and the inferences therefrom are susceptible of more than one conclusion, the choice between those conclusions should not be made as a matter of law, but should be submitted to the trier of fact. See *Goodwich*, 343 Md. at 207, 680 A.2d 1067.

In the absence of a dispute as to material fact, the reviewing court must decide "whether the [trial] court reached the correct legal result." *Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md.App. 538, 547, 707 A.2d 913 (1998); *see Goodwich*, 343 Md. at 204, 680 A.2d 1067; *Rosenblatt*, 335 Md. at 69, 642 A.2d 180; *Beatty*, 330 Md. at 737, 625 A.2d 1005; *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). Our review of a grant of summary judgment is generally limited to "the grounds relied upon by the trial court." *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995); *see Gross v. Sussex Inc.*, 332 Md. 247,

254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron & Metal Co., Inc.,* 108 Md.App. 117, 132, 671 A.2d 55 (1996).

Appellants contend that the court erred when it ruled, as a matter of law, that the decedent was contributorily negligent, or had assumed the risk, or that an agency relationship had been created between the decedent and Keefer that barred appellants' claims. Appellants also attack the court's reliance on the content of the Answers in granting summary judgment. In this regard, appellants contend that the oath supporting Keefer's Answers was defective under Md. Rules 1–304 and 2–501(c), and that the Answers violated the dead man's statute, codified at Md.Code (1998 Repl.Vol.), § 9–116 of the Courts and Judicial Proceedings Article ("C.J."). Appellants insist that, without the Answers, which should not have been considered, the evidence was insufficient to support summary judgment in favor of appellee.

## B. The Answers to Interrogatories

■■ Appellants acknowledge that there are several ways a party may "place before the court facts which … show that [it] is entitled as a matter of law to the ruling [it] seeks," *Vanhook v. Merchants Mut. Ins. Co.,* 22 Md.App. 22, 26, 321 A.2d 540 (1974), including by affidavit, deposition, answers to interrogatories, and admissions of fact. *Id.* at 26–27, 321 A.2d 540. Relying on Md. Rules 1–304 and 2–501(c),[6] however, they contend that the oath supporting Keefer's Answers was defec-

---

6. Maryland Rule 2–501(c) provides:

(c) *Form of affidavit.* An affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit.

Maryland Rule 1–304, captioned "Form of affidavit," states:

The statement of the affiant may be made before an officer authorized to administer an oath or affirmation, who shall certify in writing to having administered the oath or taken the affirmation, or may be made by signing the statement in one of the following forms:

Generally. "I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief."

tive, because appellee stated that the information was provided only to the "best of [appellee's] knowledge, information, and belief." Appellants also complain that certain statements in the Answers violated C.J. § 9–116,[7] which states:

A party to a proceeding by or against a personal representative heir, devisee, distributee or legatee as such in which a judgment or decree may be rendered for or against them, . . . may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

Accordingly, in considering appellee's summary judgment motion, appellants maintain that the court should have disregarded the content of the Answers.

---

Personal Knowledge. "I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true."
Although answers to interrogatories must be made under oath, appellee's oath was, in substance, the same as the oath governing affidavits, set forth in Rule 1–304.

7. Appellants complain about Keefer's responses to interrogatories four and six. Keefer's answers to these interrogatories were as follows:
*Interrogatory No. 4:* If at any time in this case you know or believe that you will rely upon any statements made by anyone, state the name and address of the person making each such statement . . . and state the date, time, and place that the statement was made. . . .
*ANSWER:* As we were leaving Shoenagles in Little Orleans, Maryland, Ms. Keefer took the keys to her vehicle, threw them on the ground and told me, "You drive, you're driving me home."

\* \* \*

*Interrogatory No. 6:* If you claim or intend to claim that any person acted in such a manner as to cause or contribute to the matters mentioned in the pleading, give a concise statement of the facts upon which you rely. . . .
*ANSWER:* I claim that Rebecca Faith contributed to the happening of this occurrence. I had spent the entire evening with her. Even though she knew I was under age, she brought alcohol for me to consume. Knowing that I was too young to legally drink alcohol, she continued to purchase it for me and then knowing that I was intoxicated, insisted that I drive her home.

Although appellants had ample opportunity to complain below that the form of oath of the Answers was defective, and that the dead man's statute barred appellee's reliance on the Answers, neither of these arguments was raised in the motion in limine, in appellants' opposition to the motion for summary judgment, or during oral argument at the motions hearing. Instead, appellants focused on their contention that the Answers should be excluded because of appellee's earlier reliance on his Fifth Amendment privilege. As these contentions have been raised for the first time on appeal, they are not preserved for appellate review, and we decline to consider them. *See* Md. Rule 8–131(a). *See also Gittin v. Haught–Bingham,* 123 Md.App. 44, 48, 716 A.2d 1063 (1998); *Duckworth v. District Court of Maryland,* 119 Md.App. 73, 75, 703 A.2d 1350 (1998); *Cole v. Sullivan,* 110 Md.App. 79, 89, 676 A.2d 85 (1996); *Beeman v. Department of Health & Mental Hygiene,* 107 Md.App. 122, 159, 666 A.2d 1314 (1995).

■ In reaching the conclusion that these claims are not preserved, we are guided by *Guerassio v. American Bankers Corp.,* 236 Md. 500, 204 A.2d 568 (1964). There, the appellants sought to overturn the trial court's decision to grant summary judgment in favor of the appellee. To support their cause, the appellants argued, for the first time on appeal, that the affidavit in support of the appellee's motion was defective. *Id.* at 504–05, 204 A.2d 568. The Court of Appeals declined to consider that contention. It stated:

> [A]ppellants were required to raise whatever issues they desired to interpose to the motion at or before the time of hearing in the trial court by affidavit or deposition.... At any rate this question can not now be raised.... *[A]ppellants may not overturn a summary judgment by raising here an issue that was not plainly disclosed as a genuine issue in the trial court.*

*Id.* at 505, 204 A.2d 568 (internal citations omitted)(emphasis added). *See also Fishman Const. Co. v. Hansen,* 238 Md. 418, 424, 209 A.2d 605 (1965)(holding that appellant's challenge to

the form of the supporting affidavit could not be presented for the first time on appeal).

What we said in *Gittin v. Haught–Bingham, supra,* 123 Md.App. at 51, 716 A.2d 1063, mirrors our position here:

> Whatever limited discretion an appellate court may have to consider unpreserved issues pursuant to Md. Rule 8–131(a) such discretion should be exercised only in extraordinary circumstances and within the bounds of fairness to both parties and to the court, not just to the party seeking the exercise of that discretion. We are not persuaded that the circumstances and facts of this case require a departure from established precedent. The requirements of the applicable rules are long standing and clear. The applicable law is not in transition. Therefore, [we conclude that] no error was preserved for our review. . . .

### C. Agency

Appellants contend that, even if the Answers were properly considered, the lower court erred in granting summary judgment based on principles of agency, because the evidence was not sufficient to establish, as a matter of law, a principal-agent relationship between Rebecca and Keefer. Appellants essentially claim that the trial court erred because it based its decision on appellee's self-serving, uncorroborated assertion in the Answers that, when he and the decedent "were leaving Shoenagles [she] took the keys to her vehicle, threw them on the ground and told [appellee], 'You drive, you're driving home.'" Appellants maintain that there was no evidence from which the court could infer that Rebecca retained direction, supervision, and control over Keefer to establish an agency relationship as a matter of law.

Relying on *Slutter v. Homer,* 244 Md. 131, 139, 223 A.2d 141 (1966), appellee posits that an agency relationship existed, as a matter of law, which defeated appellants' claims. In determining whether an agency theory applies, Keefer urges us to consider "the relationship of the parties and the nature of the expedition during which the accident occurred." Appellee

points to the undisputed facts that Rebecca owned the vehicle and he was driving them to the boarding house.

■■■■■ "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). In *Green v. H & R Block, Inc.*, 355 Md. 488, 735 A.2d 1039 (1999), the Court recognized that "[t]he creation of an agency relationship ultimately turns on the parties' intentions as manifested by their agreements or actions." *Green*, 355 Md. at 503, 735 A.2d 1039. Although an agency relationship "can be created [either] by express agreement or by inference from the acts of the agent and principal," *id.*, there are several factors that are relevant to determine the existence of such a relationship. *Id.* at 503–04, 735 A.2d 1039. These include the agent's power to alter the legal relations of the principal, the agent's duty to act primarily for the benefit of the principal, and the principal's right to control the agent. *Id.; see also United Capitol Ins. v. Kapiloff*, 155 F.3d 488, 498 (4ᵗʰ Cir.1998); *Schear v. Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240 (1985); Restatement (Second) of Agency §§ 12–14 (1958). These factors, however, are "neither exclusive nor conclusive considerations in determining the existence of an agency relationship." *Green*, 355 Md. at 506, 735 A.2d 1039.

■■■ In *Mackey v. Dorsey*, 104 Md.App. 250, 260, 655 A.2d 1333 (1995), we said: "[U]nder Maryland law there is a presumption that 'the negligent operator of a vehicle is the agent, servant, or employee of the owner acting within the scope of his employment.' This presumption is a rebuttable one, however . . . ." (quoting *Williams v. Wheeler*, 252 Md. 75, 82, 249 A.2d 104 (1969)) (citations omitted). *See also Toscano v. Spriggs*, 343 Md. 320, 325, 681 A.2d 61 (1996); *Rogers v. Frush*, 257 Md. 233, 244, 262 A.2d 549 (1970); *Campfield v. Crowther*, 252 Md. 88, 96, 249 A.2d 168 (1969); *House v. Jerosimich*, 246 Md. 747, 750, 230 A.2d 282 (1967); *Phillips v. Cook*, 239 Md. 215, 222, 210 A.2d 743 (1965); *State ex rel.*

*Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472 (1962); *Hoerr v. Hanline,* 219 Md. 413, 419–420, 149 A.2d 378 (1959).

■ Of particular relevance here, the Court in *Green* emphasized that, ordinarily, "the question of the existence of the agency relationship is a factual matter and *must* be submitted to the jury." *Green,* 355 Md. at 504, 735 A.2d 1039 (emphasis added); *see Faya v. Almaraz,* 329 Md. 435, 460, 620 A.2d 327 (1993); *P. Flanigan & Sons v. Childs,* 251 Md. 646, 653, 248 A.2d 473 (1968). Accordingly, even assuming that appellee presented legally sufficient evidence of an agency relationship, whether an agency relationship was actually created "is a factual matter and must be submitted to the jury." *Green,* 355 Md. at 527, 735 A.2d 1039. On this basis, we are satisfied that summary judgment was not warranted.

■ Moreover, regardless of whether a principal-agent relationship existed between the decedent and Keefer, we believe that the court erred in granting summary judgment. This is because appellee's agency theory was premised on the view that a principal cannot lodge a negligence claim against his own agent. We disagree with that position.

In *Slutter,* 244 Md. 131, 223 A.2d 141, on which appellee relies, an owner-passenger-parent sued a third party for personal injuries she sustained in an accident in which her daughter-driver had been contributorily negligent. 244 Md. at 134, 223 A.2d 141. The trial court granted a directed verdict against the mother on the ground that the daughter was contributorily negligent as a matter of law, and her negligence was imputed to the mother. *Id.* at 135, 223 A.2d 141. The Court of Appeals affirmed, concluding that the mother was barred from recovery "because of the negligence of her daughter, whether that holding is based on the law of agency or on the controversial doctrine of imputed negligence." *Id.* at 140, 223 A.2d 141.[8] In reaching its decision, the Court distinguished the theory of agency from that of imputed negligence.

---

8. In its discussion, the Court acknowledged that "the imputed negligence theory had been criticized as unrealistic and fictitious," because

The doctrine of imputed negligence rests on the presumption that the non-driving owner had the right to control the vehicle. That presumption ... is rebuttable; the presumption is based, not on the actual exercise of control, but on the right to exercise it. The agency doctrine, on the other hand, rests on the relationship of the parties and the nature of the expedition during which the accident occurred. Imputed negligence, like agency, is based on the relationship, but turns on the facts in respect of the right to control, whereas the agency theory applies where it is pertinent, irrespective of the momentary right of physical control. In short, the agency doctrine is predicated on a status rather than on inference of fact.

*Id.* at 139, 223 A.2d 141. Further, the Court observed:

"[I]f the purpose of the journey is for the benefit of the owner, even though it is also for the benefit of him who is permitted to drive, the owner may under the principles of the law of Agency be regarded as the master of the driver even though no wages or reward other than the participation in the drive is paid to him."

*Id.* at 140, 223 A.2d 141 (quoting the Restatement (Second) of Torts, § 491, Comment j).

*Slutter* is distinguishable from the case at bar, however. This is because it involved a suit by an owner-passenger against a third party, notwithstanding the negligence of the person driving the owner's car. Here, we have a suit that derives from a passenger's claim against the driver of her own car, not a claim against a third party.

The Restatement (Second) of Agency § 379 (1958) is helpful to our analysis. It recognizes that there are circumstances when a principal may sue an agent for negligence. According to the Restatement, the "gratuitous agent [9] is under a duty to

---

"while back-seat driving is generally an annoyance, and sometimes a danger, it is almost never a physical fact." *Id.* at 139, 223 A.2d 141.

9. A gratuitous agency is one in which an agency relationship is created without consideration. *See* Comment b of Restatement (Second) of Agency § 16.

the principal to act with the care and skill which is required of persons not agents performing similar gratuitous undertakings for others." Restatement (Second) of Agency § 379 (1958). Comment b to this section provides that a "gratuitous agent is subject to liability [to the principal] in an action in tort." Comment e is also noteworthy. It provides: "The liability of gratuitous agents to their principals for failure to exercise care is determined by the same principles which apply to the liability of persons who are not agents and who gratuitously act for the benefit of others . . . ."

Section 415 of the Restatement (Second) of Agency (1958) recognizes that the "liability of the agent to the principal can be avoided, terminated, or reduced by [the principal's] contributory fault. . . ." Comment b to that section explains:

An agent against whom a principal brings an action in tort for negligence has the defense of contributory negligence in accordance with the rules stated in the Restatement of Torts §§ 463–493 . . . .

Where a master, hurt by the combined negligence of his servant and a third person brings an action against the third person, it is sometimes said that "the negligence of the servant is imputed to the master." This fictitious method of statement in such cases does not prevent the servant from being liable to the master.

Interestingly, illustration 5 gives the following example:

P's servant, A, negligently drives P's automobile with P as a passenger and collides with T, who is negligently driving another automobile. P and T cannot recover from each other; T cannot recover from A, but P can recover from A.

*Williams v. Knapp*, 248 Md. 506, 237 A.2d 450 (1968), is also instructive. There, the Court of Appeals considered "whether the owner of an automobile, who [was] also a passenger therein, can recover, from the driver, damages for injuries sustained as a result of the driver's negligence." *Id.* at 507, 237 A.2d 450. On appeal, the driver-appellee, in whose favor summary judgment had been granted, claimed that " ' an owner of a car has a right to control it when he is a passenger,

and that he is presumed to exercise this right and to have consented to the negligent operation by the driver.'" *Id.* at 509, 237 A.2d 450. Moreover, he urged the Court to rule that "'the owner's presence in the car raises a presumption which the owner must rebut and that in the absence of such evidence the presumption of consent to negligence must control.'" *Id.*

The Court of Appeals rejected the driver's argument. Quoting from *Powers v. State ex rel. Reynolds,* 178 Md. 23, 31, 11 A.2d 909 (1940), the Court acknowledged that, under the doctrine of imputed negligence, the "'general rule is that where the occupants of a vehicle are engaged in a joint enterprise, the negligence of one member of the enterprise will be imputed to another when the action is brought against a third party....'" *Knapp,* 248 Md. at 510, 237 A.2d 450. Nevertheless, the Court recognized that this "'rule does not apply when one member of the enterprise brings the action against another member who owns or operates the vehicle [because] *the doctrine of imputed negligence is inapplicable as between the parties.'*" *Id.* (quoting *Powers,* 178 Md. at 31, 11 A.2d 909). The *Knapp* Court explained that the doctrine of imputed negligence originated in response to public policy considerations. Quoting from W. Prosser, *The Law of Torts* at 494–95 (3d ed.1964), the Court said:

> "The alarming increase in traffic accidents, together with the frequent financial irresponsibility of the individual driving the car, has led to a search for some basis for imposing liability upon the owner of the vehicle, even though he is free from negligence himself. Bluntly put, it is felt that, since automobiles are expensive, the owner is more likely to be able to pay any damages than the driver, who may be entirely impecunious; and that the owner is the obvious person to carry the necessary insurance to cover the risk, and so to distribute any losses among motorists as a class."

*Knapp,* 248 Md. at 508, 237 A.2d 450. These considerations are not present in a suit by the owner-passenger against the driver, however. The Court reasoned:

In the circumstances here present we see no reason for the application of the presumption [that the driver] urges. The ordinary rules by which primary negligence and contributory negligence are determined seem, to us, to be wholly adequate. We shall not, therefore, undertake a detailed discussion of the cases in which the imputation of negligence, *on whatever theory*, has been invoked. For an exhaustive comment thereon see a note in 27 Md. Law Rev. 387 (1967), inspired, without doubt, by our recent decision in *Slutter v. Homer, supra*, [244 Md. 131, 223 A.2d 141]. It will be noted that in all of those cases, up to and including *Slutter*, a third party was present.

*Id.* at 509–10, 237 A.2d 450 (emphasis added).

Although *Knapp* expressly addressed and rejected only the presumption of imputed negligence in a suit by a passenger-owner against the authorized driver, the logic and rationale of *Knapp* apply here. In our view, agency principles do not, as a matter of law, necessarily defeat the claim of an owner-passenger who sues his or her driver for injuries caused by the driver's negligence. In other words, even if an agency relationship existed between the decedent and appellee because of the rebuttable presumption that the driver of the decedent's car was the decedent's agent, this would not have precluded the decedent, had she lived, from suing the driver for his negligent driving. *See Bogley v. Middleton Tavern, Inc.*, 288 Md. 645, 650, 421 A.2d 571 (1980)(noting that agent may be liable to principal if the agent fails to exercise reasonable care and skill in performance of agent's responsibilities); *Chew v. Meyer*, 72 Md.App. 132, 142 n. 2, 527 A.2d 828 (1987) (same). *Cf. Nationwide Mutual Insurance Co. v. Stroh*, 314 Md. 176, 185, 550 A.2d 373 (1988) (refusing to impute negligence of co-owner driver to co-owner passenger, because such a result would "not further the primary policy aim undergirding the doctrine of imputed negligence, namely, that of locating a 'deep pocket' to provide recovery to an innocent victim of another's negligence").

In view of the foregoing, we are persuaded that the trial court erred to the extent it granted summary judgment in favor of appellee based on an agency theory.

### D. Contributory Negligence and Assumption of Risk

 Appellants argue that the circuit court erred in granting summary judgment based on the doctrines of contributory negligence and assumption of risk. They argue that there was insufficient evidence to show that the decedent knew Keefer was a minor, or was intoxicated, and no evidence that the decedent appreciated the risk of danger. Further, appellants posit that reasonable minds could differ about whether the proximate cause of the accident was Keefer's speed or his state of intoxication or both. Appellee asserts that, by buying liquor for appellee, giving him the keys to her vehicle, and riding as a passenger with Keefer knowing that he had been drinking heavily, Rebecca "failed to act in [a] manner consistent with the knowledge and appreciation of the danger that her conduct involved." Appellants maintain, however, that Rebecca was the only person who could actually testify whether she "knew" Keefer was under the legal age to consume alcohol or "knew" Keefer was intoxicated when he attempted to operate the vehicle. Moreover, they observe: "It is terribly convenient for Keefer to make these statements as the only person who can verify them is dead."

 In Maryland, "Contributory negligence connotes a failure to observe ordinary care for one's own safety. 'It is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances.'" *Smith v. Warbasse,* 71 Md.App. 625, 627, 526 A.2d 991 (1987)(quoting *Menish v. Polinger Co.,* 277 Md. 553, 559, 356 A.2d 233 (1976)); *see CIGNA Property and Cas. Cos. v. Zeitler,* 126 Md.App. 444, 488, 730 A.2d 248 (1999). Contributory negligence "'occurs whenever the injured person acts or fails to act in a manner consistent with the knowledge or appreciation, actual or implied, of the danger or injury that his or her conduct involves.'" *Campbell v. Montgomery County*

**746**

*Bd. of Educ.,* 73 Md.App. 54, 64, 533 A.2d 9 (1987)(quoting Gilbert, *Maryland Tort Law Handbook,* § 11.4.1), *cert. denied,* 311 Md. 719, 537 A.2d 273 (1988); *see also County Comm'rs v. Bell Atlantic–Maryland, Inc.,* 346 Md. 160, 180, 695 A.2d 171 (1997); *Wegad v. Howard Street Jewelers,* 326 Md. 409, 418, 605 A.2d 123 (1992).

The burden of proving contributory negligence rests on the defendant. *Myers v. Bright,* 327 Md. 395, 403, 609 A.2d 1182 (1992). A plaintiff in Maryland who is contributorily negligent generally cannot recover in a suit against a defendant. *Maryland Civil Pattern Jury Instructions* § 19:11, at 494 (3d ed.1999) provides:

CONTRIBUTORY NEGLIGENCE—GENERALLY

A plaintiff cannot recover if the plaintiff's negligence is a cause of the injury.

The defendant has the burden of proving by a preponderance of the evidence that the plaintiff's negligence was a cause of the plaintiff's injury.

Ordinarily, the issue of contributory negligence is a question of fact for the jury to resolve. *See McQuay v. Schertle,* 126 Md.App. 556, 569, 730 A.2d 714 (1999). What we said in *Campbell,* 73 Md.App. at 64, 533 A.2d 9, is pertinent here:

A case may not be taken from a jury on the ground of contributory negligence unless the evidence demonstrates "some prominent and decisive act which directly contributed to the ... [incident] and *which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.*"

(Quoting *Baltimore Transit Co. v. State ex rel. Castranda,* 194 Md. 421, 434, 71 A.2d 442 (1950))(emphasis added). As we explained in *McSlarrow v. Walker,* 56 Md.App. 151, 161, 467 A.2d 196 (1983), *cert. denied,* 299 Md. 137, 472 A.2d 1000 (1984):

Contributory negligence as a matter of law requires a finding that the negligent act of the plaintiff ... relied upon

must be prominent, decisive and one about which ordinary minds would not differ in declaring it to be negligence. *Yockel v. Gerstadt,* 154 Md. 188, 140 A. 40 (1927). The standard of care to be used in measuring contributory negligence is the conduct of an ordinarily prudent person under similar circumstances; and even if the act done turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error. *Sanders v. Williams,* 209 Md. 149, 120 A.2d 397 (1955).

 The elements of the affirmative defense of assumption of the risk are equally well settled. The defendant must show: (1) the plaintiff had knowledge of the risk of danger; (2) the plaintiff appreciated that risk; and (3) the plaintiff voluntarily encountered the risk of danger. *ADM Partnership v. Martin,* 348 Md. 84, 90–91, 702 A.2d 730 (1997); *see Liscombe v. Potomac Edison Co.,* 303 Md. 619, 630, 495 A.2d 838 (1985); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 487 (5th ed.1984). The Court explained in *ADM Partnership,* 348 Md. at 91–92, 702 A.2d 730:

Assumption of risk means "voluntary incurring that of an accident which may not occur, and which the person assuming the risk may be careful to avoid after starting." Thus, if established, it functions as a complete bar to recovery because "it is a previous abandonment of the right to complain if an accident occurs."

"In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him." Thus, "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." Moreover, "there are certain risks which anyone of adult age must be taken to appreciate: the danger of slipping on ice, of falling

748

through unguarded openings, of lifting heavy objects . . . and doubtless many others."

(Internal citations omitted).

In analyzing the affirmative defenses on which appellee relies, we observe that Keefer has not referred us to any case in which the court granted *summary judgment* on the ground that the driver's consumption of alcohol, as a matter of law, defeats a suit initiated by a passenger who had also been drinking or who authorized the driver to operate the vehicle, notwithstanding that the driver had been drinking. In our research, we have found several Maryland cases in which the defendant contended *at trial* that the plaintiff's suit was barred due to the plaintiff's contributory negligence or assumption of risk in riding as a passenger when the driver was under the influence of alcohol. We perceive it significant, however, that in each case the issues of contributory negligence or assumption of risk were resolved *at trial,* not by way of a pre-trial *motion.*

The case of *Baltimore County v. State ex rel. Keenan,* 232 Md. 350, 193 A.2d 30 (1963), is illustrative. There, the family of a passenger who was killed in an automobile accident instituted suit against the owner/driver of that vehicle, as well as the operator of another vehicle and that operator's county employer. After the jury returned a verdict in favor of the passenger's family, the county and its driver appealed, but the driver of the vehicle in which the decedent had traveled did not appeal. The appellants claimed, *inter alia,* that the trial court erred in refusing to instruct the jury on the issues of assumption of risk and contributory negligence. *Id.* at 353, 193 A.2d 30. Specifically, they argued that, as the driver was under the influence of alcohol when he and his passenger proceeded in the driver's car, the passenger knew or should have known that the driver was intoxicated. Therefore, the passenger either assumed the risk or was contributorily negligent in riding in the vehicle. *Id.* at 354, 193 A.2d 30.

The Court of Appeals acknowledged that it was a "rather close question whether the evidence admitted at the trial was

sufficient to go to the jury as showing that [the decedent] knew or ought to have known that [the driver] was too intoxicated to be in condition to drive safely. . . ." *Id.* at 366, 193 A.2d 30. Ultimately, the Court agreed with the appellants that the trial court erred in refusing to instruct the jury as to assumption of risk or contributory negligence on the part of the decedent. *Id.* at 367, 193 A.2d 30. The Court explained that "entrusting one's safety to a driver whom one knows, or ought to know, to be intoxicated", *id.* at 362, 193 A.2d 30, *may* bar recovery whether such conduct is "considered as amounting to assumption of risk . . . or as contributory negligence," *id.* at 362–63, 193 A.2d 30, provided that "the driver's negligence, due to intoxication, is a proximate cause of the accident. . . ." *Id.* at 366, 193 A.2d 30 (Emphasis added). Quoting *Packard v. Quesnel,* 112 Vt. 175, 22 A.2d 164, 167 (1941), the Court also said:

> "Reason and authority alike support the rule that if a person voluntarily rides in an automobile driven by one who is intoxicated and the passenger knows, or under the circumstances should have known, the intoxicated condition of the driver he is precluded from recovering from such driver or a third person for injuries sustained in an accident if the intoxicated condition of the driver was the proximate cause or one of the proximate causes of the accident producing the injuries in question. . . ."

*Keenan,* 232 Md. at 365, 193 A.2d 30.

In reaching its holding in *Keenan,* the Court relied on the case of *Powers v. State ex rel. Reynolds, supra,* 178 Md. 23, 11 A.2d 909, in which the State, on behalf of the parents of a deceased passenger, sought to recover against Powers, who was the owner of the vehicle, and Coffman, the driver of the vehicle. On the evening of the accident, Powers, Coffman, Coffman's wife, and the decedent drove to a night club where they all consumed alcohol. *Id.* at 27, 11 A.2d 909. When the group left the club, Powers realized he was not in a condition to drive. Therefore, he entered the back seat and Coffman took the wheel. *Id.* On their way home, an accident ensued; the decedent was thrown from the vehicle and killed. *Id.*

After the jury rendered a verdict against the defendants, they appealed. The defendants argued that the trial court erred by: (1) refusing to instruct the jury that if it found the decedent rode in the vehicle driven by Coffman, although she knew he had been drinking, she was guilty of contributory negligence, and (2) refusing the defendants' prayer for directed verdict if the jury found that Coffman had taken three drinks during the evening. *Id.* at 33, 11 A.2d 909. The Court of Appeals rejected the defendants' contentions, concluding that the "jury had the right to take into consideration all of the testimony in the case in deciding whether [the decedent] was guilty of contributory negligence." *Id.* The Court explained:

It [has been] contended that [the passenger] was guilty of contributory negligence because of a voluntary assumption of risk. The test in determining voluntary assumption of risk is whether there was an intentional and unreasonable exposure to danger, which the plaintiff either knew or had reason to know. **A guest is not negligent in riding with an intoxicated driver, if he is unaware of the intoxication or does not notice any facts which would arouse the suspicions of a person of ordinary prudence.** If a driver's unfitness is not discovered until after the car is on a lonely road in a part of the country with which the plaintiff is unfamiliar, particularly if late at night, it may be the part of prudence to remain in the car, unless the driver is so incompetent or reckless that a reasonable man would recognize that there was a great likelihood of an accident. **It has been repeatedly held that a guest is not contributorily negligent as a matter of law in riding in an automobile, after he and the driver have been drinking together. So, on the issue of a guest's contributory negligence in riding with an intoxicated driver, such questions as the amount of intoxicating liquor the driver had consumed, the extent of the driver's intoxication, and how much the guest was aware of it, are usually questions for the jury in determining whether there was an assumption of risk. . . . In Maryland, even though it is testified that a**

**driver was intoxicated, and there is evidence to the contrary, the question of the contributory negligence of the plaintiff in entrusting her safety to the driver is a question which should be submitted to the jury.**

*Id.* at 31–33, 11 A.2d 909 (internal citations omitted) (boldface added).

The case of *Bliss v. Wiatrowski,* 125 Md.App. 258, 724 A.2d 1264, *cert. denied,* 354 Md. 571, 731 A.2d 970 (1999), is also noteworthy. There, four teenagers spent most of the afternoon and evening drinking together. As they were driving home, the driver of the vehicle in which they were riding veered off the road and struck a tree, killing one of the passengers. A surviving passenger sued the driver, alleging negligence. Although the jury found the driver negligent, the jury rendered a verdict for the driver on the ground that the plaintiff had assumed the risk of danger of the driver's actions. *Id.* at 264, 724 A.2d 1264.

On appeal, the plaintiff complained, *inter alia,* that the court erred in allowing the jury to consider the defense of assumption of risk. Specifically, she argued:

First, ... the defense of assumption of the risk does not apply when a defendant's negligence is based on the statutory offense of driving under the influence of alcohol, because allowing a defendant to escape liability when the plaintiff knew that the defendant was violating a statute defeats a purpose of the statute. Second, ... because [the driver's] failure to abide by the posted speed limit, not his alcohol consumption, was the proximate cause of the accident, whether she knew [the driver] was intoxicated could not serve as a basis for her assuming the risk. Lastly, ... there was insufficient evidence for a jury to find that she assumed the risk.

*Id.* at 272, 724 A.2d 1264.

We rejected the plaintiff's contentions. First, we recognized that "no Maryland law prohibits the application of the defense of assumption of risk in cases where the defendant's negligence relies on a statutory violation." *Id.* Rather, relying

on *Keenan, supra,* 232 Md. at 366, 193 A.2d 30, we reiterated that "it is well established in Maryland that assumption of risk *may* bar recovery by a passenger in a car driven by an intoxicated driver, if the passenger knew or should have known of the driver's condition, and if the driver's negligence, due to the intoxication, is a proximate cause of the accident." *Bliss,* 125 Md.App. at 272, 724 A.2d 1264 (emphasis added). Further, we determined, based on the evidence presented at trial, that "the jury could have reasonably concluded that [the driver's] intoxication was a proximate cause of the accident." *Id.* The evidence included medical records indicating that the driver's blood alcohol level was .10 after the accident; testimony from the driver, the plaintiff, and the other surviving passenger that they drank a significant amount of alcohol that night; and the driver's subsequent guilty plea to "homicide by automobile while under the influence of alcohol." *Id.* at 273, 724 A.2d 1264. In addition, we held that the evidence was legally sufficient to find that the passenger knew the driver was "intoxicated, knew about the danger of riding with a drunk driver, yet assumed that risk by voluntarily getting into the car with [the driver]...." *Id.* Specifically, we considered that the plaintiff was with the driver when he purchased the alcohol that evening; "she observed his heavy drinking throughout the night; she had been in a car accident two years earlier where alcohol use had been a factor; she testified that her mother asked her not to ride with people who had been drinking alcohol; and she was aware that a person's reaction time was not as quick after drinking alcohol." *Id.* Therefore, we held that "there was ample evidence from which the jury could have concluded that [the passenger plaintiff] assumed the risk of the danger in riding with [the driver]." *Id.*

We glean several important points from the cases discussed above. First, as we said, in these kinds of cases the issues of contributory negligence and assumption of risk are generally resolved by a jury. Second, none of the cases suggests that, as a matter of law, a passenger's claim against an intoxicated driver automatically fails if there is any evidence showing that the passenger knew that the driver had been drinking. We

are particularly troubled here because: 1) appellee's deposition was never completed, and so the facts that appellee suggests compelled summary judgment in his favor were provided by him by way of answers to interrogatories; 2) the only other eyewitness died at the scene; 3) appellee's version of events was largely uncorroborated; 4) the affirmative defenses lodged by appellee are ordinarily resolved by a jury at trial; and 5) given the posture of this case, summary judgment hinged entirely on appellee's credibility, which is solely a matter for the jury to assess.[10]

If believed by the jury, appellee's version of events surely could defeat appellants' recovery. But, a jury need not believe appellee's testimony, even if it is uncontradicted. Moreover, "In resolving a motion for summary judgment, the trial court may not determine the credibility of witnesses." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996) (citations omitted). *See also Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978)(noting that the court on a motion for summary judgment "does not attempt to decide any issue of fact or credibility, but only whether such issues exist") (citations omitted). *Accord Gross v. Sussex Inc.*, 332 Md. 247, 256–57, 630 A.2d 1156 (1993); *Coffey v. Derby Steel Co.*, 291 Md. 241, 247, 434 A.2d 564 (1981). Stated otherwise, the death of the only other eyewitness does not mandate a judgment in appellee's favor. To the contrary, the jury could determine that appellee's account is nothing more than a self-serving attempt to blame the victim, who unfortunately cannot refute what the jury might perceive as unsubstantiated, convenient accusations.

Given the circumstances attendant in this wrongful death and survival action, the presumption of due care in favor of the

---

**10.** We are mindful that appellee offered to resume his deposition, which would have enabled appellant's attorney to question him. On the other hand, as we have already discussed, appellants' counsel opted not to do so, because of his good faith belief that appellee's earlier reliance on his Fifth Amendment privilege would preclude appellee from relying on his answers to interrogatories.

decedent has particular significance. Although neither party has addressed the presumption, we believe that the court erred in awarding summary judgment based on contributory negligence, because of the presumption that the decedent exercised due care for her own safety. We explain.

The Court of Appeals has made clear that, "before a person killed in an accident can be declared to have been guilty of contributory negligence as a matter of law, the trial court must give consideration to the presumption that he exercised ordinary care for his own safety in accordance with the natural instinct of human beings to guard against danger." *Baltimore Transit Co. v. State ex rel. Castranda, supra,* 194 Md. at 434, 71 A.2d 442; *see State ex rel. Ridgway v. Capital Transit Co.,* 194 Md. 656, 663, 72 A.2d 245 (1950). Recently, in *McQuay v. Schertle, supra,* 126 Md.App. 556, 730 A.2d 714, we examined the effect of the court's failure to give a jury instruction concerning the presumption of due care.

In *McQuay,* the decedent had parked her car at a marine terminal in the path of a tractor carrying eight tons of wood pulp. When the tractor operator spotted the decedent's vehicle, he stopped suddenly, causing the cargo to topple onto the vehicle. The decedent was crushed to death by the cargo. The jury found the driver of the tractor negligent and it also found the decedent contributorily negligent. Although we reversed on other grounds, we concluded that the trial court properly submitted the issue of contributory negligence to the jury, and did not err by failing to instruct on the presumption of due care.

In analyzing the jury instructions, Judge Byrnes, writing for the Court, thoroughly explained the presumption of due care:

When the decedent's conduct at the time of the accident is in dispute and his actions cannot be established by evidence other than his own obviously unavailable testimony, the presumption of due care fills the evidentiary void created by his absence. In that way, the presumption levels the playing field in those cases in which the decedent's conduct is under attack but, as a consequence of the accident itself, he

is unable to defend himself. To some extent probability is involved: Because people usually do not act so as to cause themselves harm, it is probable that the decedent was not putting himself in danger at the time of the accident; therefore, if by magic the decedent could be made to reappear and testify about what he had been doing immediately before the accident, his testimony probably would tend to show that he had been acting carefully, and thus would counter the defendant's evidence of contributory negligence. In the appropriate case, the jury may consider the presumption in place of that missing testimony.

The Maryland cases in which an instruction on the presumption has been approved are those in which the presumption has been needed to ameliorate the unfairness brought about by the loss of the decedent's testimony. Like the presumption against a spoiler of evidence, the presumption of due care is rooted in the notion that one should not benefit from the elimination of unfavorable evidence. By the time the jury in a death by accident case has reached the issue of contributory negligence, it has already concluded, necessarily, that the defendant was negligent in the happening of the accident in which the decedent was killed. *Fairness dictates that in the absence of other evidence to show the conduct of the decedent immediately prior to the accident, and when that conduct is in dispute, the defendant should not be permitted to benefit in proving contributory negligence by the inability of the decedent to testify about his own conduct.* By contrast, in those Maryland cases in which an instruction on the presumption has been disapproved (or the refusal to so instruct has been approved), there either has not been a need to level the playing field—because the conduct of the decedent prior to the accident has not been in dispute—or there has been other evidence on that issue, usually in the form of eyewitness testimony.

*Id.* at 604–05, 730 A.2d 714 (emphasis added).

We also noted in *McQuay* that "whether the presumption applies in a given case is a matter within the discretion of the

trial judge that turns upon the nature of the evidence that has been put before the jury." *Id.* at 603, 730 A.2d 714. Although the conduct of the decedent in *McQuay* was in dispute, we held that the trial court did not abuse its discretion in refusing to give the presumption of due care instruction, because evidence was presented that compensated for the absence of the decedent's testimony, including the testimony of the passenger who was in the vehicle with the decedent and another eyewitness to the accident. *Id.* at 608, 730 A.2d 714. We said:

> Indeed, the testimony of those witnesses, particularly that of [the passenger, who observed the accident first hand but survived to tell about it] not only filled the evidentiary gap created by [the decedent's death] but also did so from her vantage point.

*Id.*

*McQuay* is readily distinguishable from this case. Here, appellee, as the lone survivor, is the only one who is able to provide an account of the events that led to the collision; there are no other eyewitnesses to the actual events. Thus, unlike in *McQuay*, there is no eyewitness testimony to compensate for the absence of Rebecca's version of what happened. As we have seen, appellee casts blame on the victim for buying the liquor, knowingly furnishing it to appellee even though he was underage, and for instructing Keefer to drive her car when she allegedly knew he was unfit to do so. Apart from appellee's self-serving statements, which a jury never had the chance to evaluate, and the decedent's position in the vehicle, the record is virtually devoid of any evidence regarding the decedent's conduct or the state of her knowledge at the relevant time. For example, appellee did not present any evidence as to his behavior just before he took the wheel, in order to show that it would have been evident to the decedent that he was unfit to drive. Further, no evidence was offered explaining the significance of appellee's blood alcohol level of .18, except the deputy's statement at his deposition that "[d]riving while intoxicated is 0.1" blood alcohol level. *Cf. Young v. Lambert*, 253 Va. 237, 482 S.E.2d 823 (Va.1997)(hold-

ing that trial court erred in instructing the jury on assumption of risk, because the driver's blood alcohol level alone was not sufficient to show that the owner-passenger knew or should have known that the driver's ability was likely impaired due to alcohol consumption). And, as we have seen, no blood alcohol tests were conducted on the decedent; that type of medical test might have helped to establish the veracity of appellee's version of events. Moreover, that the decedent asked Keefer to drive arguably suggests that she realized only that she was unable to drive.

We also cannot say, as a matter of law, that Keefer's intoxication was the proximate cause of the accident. The police report stated:

> The primary cause of the accident was speed to [sic] great for roadway conditions on approach to the Eastbound curve. This caused the vehicle to travel onto snow covered shoulder, causing the driver to overcompensate to recover and get back onto the roadway. This maneuver failed, causing the vehicle to strike the power pole. The secondary contributing cause to the accident was use of alcoholic beverage by the driver. This impaired his ability to operate the vehicle properly.

Deputy Schleigh reiterated this view at his deposition.

To be sure, appellee's account, which serves to exonerate him, may well be true, and we do not suggest otherwise. What we do suggest is that it was not the province of the court to make that determination, particularly in light of the applicability of the presumption of due care and the obligation at this juncture to view the facts and inferences in the light most favorable to appellants. As the Court said in *McQuay*, 126 Md.App. at 604, 730 A.2d 714, the presumption of due care operates to " 'correct an imbalance resulting from one party's superior access to proof.' " *See also Young v. Dietzel*, 13 Md.App. 159, 164–65, 282 A.2d 150 (1971). Accordingly, we are persuaded that, under the circumstances attendant here, the issue of whether the decedent was contributorily negligent

or had assumed the risk should not have been decided by the court, before trial, as a matter of law.

**DENIAL OF MOTION IN LIMINE AFFIRMED; SUMMARY JUDGMENT IN FAVOR OF APPELLEE REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR WASHINGTON COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANTS AND APPELLEE.**