962 A.2d 1046

Betty A. APPIAH, et al.

v.

Bruce Edward HALL, et al.

No. 2730 Sept.Term, 2007.

Court of Special Appeals of Maryland.

Dec. 31, 2008.

608

M. Albert Figinski and Jeffrey J. Utermohle (Law Offices of Peter G. Angelos, P.C., on the brief), Baltimore, MD and David E. Haynes, Cochran Firm, on the brief, Washington, DC, for Appellants.

Thomas J. Minton (Goldman & Minton, P.C., on the brief), Baltimore, MD, for Appellees.

Panel: KRAUSER, C.J., DAVIS, J., and J. FREDERICK SHARER, J. (retired, specially assigned).

DAVIS, Judge.

Appellants, Betty A. Appiah, as personal representative of the Estate of Stephen A. Appiah, deceased, and Veronica Agyarko, appeal from the grant of summary judgment in favor of the Maryland Port Administration (MPA) and P & O Ports of Baltimore, Inc. (P & O), appellees, by the Circuit Court for Baltimore City, dated December 14, 2007. Appellants present two questions for our review, which we have rephrased as follows:

1. Did the circuit court err in finding that MPA and P & O retained insufficient control to subject them to liability under Restatement (Second) of Torts § 414?

2. Did the circuit court err in granting summary judgment by disregarding disputes of material fact?

Appellees present the following two questions for our review:

1. Was appellants' appeal premature?

2. Is appellants' suit barred by the statute of limitations?

For the reasons that follow, appellants' appeal was not filed prematurely and we answer both of appellants' questions in the negative. Because of the manner of the circuit court's disposition of appellees' claim that suit was barred by limitations, we are constrained to comment upon the procedure employed. We shall, in the final analysis, affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The case arises from an accident at Seagirt Marine Terminal (Seagirt) on September 30, 2003, in which a longshoreman-mechanic, Stephen Appiah (Mr. Appiah), was struck and fatally injured by a truck owned by Den–El Transfer, Inc. (Den–El) and driven by Bruce Hall. At the time of the accident, Mr. Appiah was working for his employer, Marine Repair Services, Inc. (Marine Repair), who, in turn, was working for Mediterranean Shipping.[1]

Seagirt is owned by MPA, which is a State agency established by the legislature to own, promote and develop Maryland's port facilities. Md.Code, Transp. §§ 2–107; 6–202 (2006 Repl. Vol., 2008 Supp.). Although the State of Maryland owns Seagirt, MPA does not conduct stevedoring (vessel loading and unloading) or terminal operations there. Instead, MPA contracts that work out to private entities.

On February 16, 2001, MPA entered into a lease agreement (the Lease Agreement) with Marine Repair, under which MPA leased a small space at Seagirt to Marine Repair in an area known as Reefer Row. Under the terms of that lease, Marine Repair was to use the premises exclusively for the repairing of containers and chassis and other associated work. Other than

---

1. For a diagram of all relevant parties and their relationships to each other, see MPA's diagram attached as an appendix.

Marine Repair's Lease Agreement with MPA, Marine Repair had no other contracts of any kind with either P & O or MPA.

On October 25, 2001, MPA entered into an operating agreement (the Seagirt Agreement) with P & O. Under the terms of the agreement, P & O, as an independent contractor, was to provide stevedoring services, operate an entry gate and perform other related terminal work for the MPA on 190 acres of the total 284 acres comprising Seagirt, including the Reefer Row area. At the time of the accident, P & O acted as "terminal operator" at Seagirt pursuant to the Seagirt Agreement. P & O has been the operator of Seagirt since the facility opened in 1990.

A few days prior to the date of the accident, P & O unloaded a refrigerated container, or "reefer," of Bailey's Irish Creme from a vessel owned by Mediterranean Shipping and brought that reefer to a slot in Reefer Row. On the day of the accident, the reefer in question was to be delivered to Washington Wholesale Liquors (WWL) in Washington, D.C. After a customs broker notified WWL that the reefer had arrived in Baltimore and was available for pick up, WWL hired Den–El to transport the reefer from Seagirt to WWL's D.C. warehouse.

On the afternoon of September 30, 2003, Den–El's driver, Hall, showed up at Seagirt to pick up the reefer and was directed by P & O to proceed to the Marine Repair office trailer. When Hall arrived at the office trailer, he was met by a Marine Repair mechanic supervisor, Pat Ciociola, who had hooked up another reefer for Hall earlier that same day. Ciociola instructed Hall to find Mr. Appiah to hook up the reefer for him.

Hall drove his truck over to the location in Reefer Row where, from having made an earlier trip, he knew the reefer of Bailey's was located and backed his truck up close to the reefer. Hall then found Mr. Appiah and gave him some paperwork. Mr. Appiah retrieved a forklift, ladder and generator (genset), parked the forklift behind Hall's truck and proceeded to install the genset on the reefer and disconnect

the shore power. As Hall waited in his truck for some time, Ciociola arrived on the scene, removed the forklift parked between the truck and the reefer and drove away with the ladder.

Hall saw Ciociola driving the forklift away with the ladder on board and thought he saw Ciociola giving him an "all clear wave." Hall then drove his truck in reverse in order to latch onto the reefer, unaware that Mr. Appiah was still rolling up the power cord from the shore power source. In the process of backing up, the truck that Hall was driving struck Mr. Appiah, severely injuring him. Mr. Appiah died four days later.

On June 23, 2005, Mr. Appiah's surviving spouse and personal representative, Betty Appiah (Ms. Appiah), filed a wrongful death and survivorship action in the Circuit Court for Baltimore City. Ms. Appiah sued four defendants: (1) Hall, the truck driver who struck Mr. Appiah; (2) Den–El, Hall's employer; (3) P & O, the stevedoring and terminal operations company of the site where the accident occurred and; (4) MPA. Ms. Appiah filed two amended complaints and, on September 28, 2006, Mr. Appiah's mother, Veronica Agyarko, filed her own complaint in the Circuit Court for Baltimore City. She sued the same six defendants [2] named in Ms. Appiah's Second Amended Complaint and essentially replicated the same allegations. On March 22, 2007, the circuit court ordered that Ms. Appiah's and Agyarko's cases be consolidated. On October 26, 2007, Ms. Appiah—as did Agyarko—filed a Third Amended Complaint, citing new allegations and facts in support of appellants' cause of action.

Appellees moved for summary judgment at the close of discovery. A hearing was held on December 14, 2007, in which the circuit court granted appellees' motions for summary judgment.

---

**2.** Ms. Appiah's first and second amended complaints added the customs broker and cargo consignee as defendants in the action; however, on May 16, 2007, these two defendants were voluntarily dismissed.

As to the other two defendants, Hall and Den–El, in May 2007, appellants agreed to settle all claims they had against them. On October 12, 2007, however, appellants filed a Motion to Enforce Settlement Agreement against Hall and Den–El. On November 28, 2007, the circuit court issued an Order granting the Motion to Enforce Settlement Agreement. On December 7, 2007, appellants filed a Motion to Vacate Order Enforcing Settlement Agreement [3] and, on December 17, 2007, appellants filed a Reply to the Opposition to [Appellants'] Motion to Vacate Order Enforcing Settlement filed by Hall and Den–El on December 13, 2007. On January 7, 2008, the circuit court denied appellants' Motion to Vacate the Order Enforcing Settlement Agreement.

Ms. Appiah timely filed a Notice of Appeal on January 16, 2008, which stated:

Please enter an appeal of [appellant], [Ms.] Appiah in her various capacities as to all judgments entered in the above-captioned action and as to the Order of November 28, 2007 granting plaintiff's Motion to Enforce Settlement and the Order of January 7, 2008 denying [Ms. Appiah]'s Motion to Vacate the Order of November 28, 2007.

Agyarko timely filed a Notice of Appeal on January 25, 2008. On August 14, 2008, appellants dismissed Den–El and Hall as defendants in the suit.

Additional facts will be discussed *infra* as warranted.

## STANDARD OF REVIEW

■ A trial court may grant summary judgment where the motion and response show there is no dispute as to any material fact and the party in whose favor judgment is entered is entitled to judgment as a matter of law. *See* Md. Rule 2–501(f). We review the grant of a motion for summary judgment *de novo. Stanley v. American Fed'n of State and Mun. Employees Local No. 553,* 165 Md.App. 1, 13, 884 A.2d 724

---

3. Appellants attempted to vacate their earlier Motion to Enforce Settlement Agreement due to an issue that arose from a existing lien.

(2005) (citing *Coroneos v. Montgomery County,* 161 Md.App. 411, 422, 869 A.2d 410 (2005)). Where there is no dispute as to a material fact we determine if the trial court's decision was legally correct. *Id.* (citing *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund,* 385 Md. 99, 106, 867 A.2d 1026 (2005); *Faith v. Keefer,* 127 Md.App. 706, 734, 736 A.2d 422 (1999)). A material fact is one that will alter the outcome of the case, depending upon the factfinder's resolution of the dispute. *Faith,* 127 Md.App. at 734, 736 A.2d 422 (citing *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985)). "To generate a material factual dispute, the evidence adduced by the non-moving party must be more than 'mere general allegations which do not show facts in detail and with precision.' " *Id.* (quoting *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738, 625 A.2d 1005 (1993)). In reviewing the grant of summary judgment, we construe the facts properly before the court and any reasonable inferences that may be drawn from them, in the light most favorable to the nonmoving party. *Id.* We generally limit our review to the grounds relied upon by the trial court. *Id.* (citing *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995)). Ordinarily, we will uphold the grant of summary judgment only on the grounds relied on by the trial court. *Stanley,* 165 Md.App. at 13, 884 A.2d 724 (citing *Pac. Employers Ins. Co. v. Eig,* 160 Md.App. 416, 428, 864 A.2d 240 (2004)). With these considerations in mind, we turn to the case *sub judice.*

## LEGAL ANALYSIS

### I

### Appealability

Appellees contend that the circuit court's December 14, 2007 Order was not a final appealable judgment. Specifically, they argue that, in its December 14 order, the trial court adjudicated "the rights and liabilities of fewer than all of the parties to the action" by granting appellees, two of the four remaining defendants, summary judgment; consequently, the court's order does not constitute a final judgment. *See* Md. Rule 2–602. Pursuant to § 12–301 of Md.Code Ann., Courts

and Judicial Proceedings Article (C.J.) (2006 Repl. Vol., 2008 Supp.),[4] "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." *See also* § 12–101(f) (defining "final judgment" as "a judgment ... or other action by a court ... from which an appeal, application for leave to appeal, or petition for certiorari may be taken"). "[T]o be appealable, an order or judgment ordinarily must be final." *Baltimore Police Dep't v. Cherkes,* 140 Md.App. 282, 298, 780 A.2d 410 (2001) (internal citations omitted). When an order of summary judgment does not resolve all claims, any "appeal must be dismissed as prematurely taken, since ... the [summary] judgment remain[s][ ] interlocutory." *Brooks v. Ford Motor Credit Co.,* 261 Md. 278, 282, 274 A.2d 345 (1971). *See also County Com'rs for St. Mary's County v. Lacer,* 393 Md. 415, 427, 903 A.2d 378 (2006) (holding that partial summary judgment is not a final appealable judgment when it "did not settle completely any of the matters in controversy or adjudicate completely the rights and liabilities of the parties").

The crux of appellees' argument is that appellants' claims against Hall and Den–El were not settled until August 14, 2008, which was the date when appellants filed a Stipulation of Dismissal. Consequently, there could be no final judgment prior to that date. Appellees are correct in their assertion that, as of December 14, 2007, the trial court had adjudicated "the rights and liabilities of fewer than all of the parties to the action." At that time, appellants' Motion to Vacate the Order Enforcing Settlement Agreement with Hall and Den–El, and appellees' opposition thereto, were still pending; however, on January 7, 2008, the circuit court determined that the settlement agreement should be enforced and, on January 16, 2008, Ms. Appiah appealed "all judgments entered in the above-captioned action and as to the Order of November 28, 2007 granting [Ms. Appiah's] Motion to Enforce Settlement and the Order of January 7, 2008," denying Ms. Appiah's motion to vacate.

---

4. Unless otherwise indicated, we shall refer to Md.Code Ann., Courts and Judicial Proceedings Article § 12–301 to 12–303 (2006 Repl. Vol., 2008 Supp.).

As of January 7, 2008, there were no remaining rights or liabilities of any parties that the circuit court could adjudicate. There was no further action that the court could take and any argument that the dismissal of Hall and Den–El marked the adjudication of the rights and liabilities of all parties is without merit. When appellants filed their appeals on January 16 and 24, 2008, respectively, the rights and liabilities of *all* parties had been adjudicated. Furthermore, in light of appellants' dismissal of the actions against Den–El and Hall on August 14, 2008, the only remaining issue on appeal is the December 14, 2007 grant of summary judgment.

We have discretion under Md. Rule 8–602(e) to enter a final judgment. The Rule provides, in pertinent part:

(1) If the appellate court determines that the order from which the appeal is taken was not a final judgment *when the notice of appeal was filed* but that the lower court had discretion to direct the entry of a final judgment pursuant to Rule 2–602(b), the *appellate court* may, as it finds appropriate, (A) dismiss the appeal, (B) remand the case for the lower court to decide whether to direct the entry of a final judgment, (C) enter a final judgment on its own initiative or *(D) if a final judgment was entered by the lower court after the notice of appeal was filed, treat the notice of appeal as if filed on the same day as, but after, the entry of the judgment.*

(2) If, upon remand, the lower court decides not to direct entry of a final judgment pursuant to Rule 2–602(b), the lower court shall promptly notify the appellate court of its decision and the appellate court shall dismiss the appeal. If, upon remand, the lower court determines that there is no just reason for delay and directs the entry of a final judgment pursuant to Rule 2–602(b), the case shall be returned to the appellate court after entry of the judgment. The appellate court shall treat the notice of appeal as if filed on the date of entry of the judgment.

(3) If the *appellate court* enters a final judgment on its own initiative, *it shall treat the notice of appeal as if filed on the*

*date of the entry of the judgment* and proceed with the appeal.

(Emphasis added).

██ Prior to the December 14, 2007 grant of summary judgment, appellees had filed cross claims and amended cross claims against Hall and Den–El, primarily seeking indemnification and contribution for any liability arising out of the death of Mr. Appiah. These cross claims were stricken on August 3, 2007 and November 28, 2007. Appellees concede that we have discretion under Rule 8–202(e) and our decision in *Crowder v. Master Financial, Inc.,* 176 Md.App. 631, 644–45, 933 A.2d 905 (2007), to retroactively enter a final judgment to avoid imposing hardship on the parties or based on a finding that the parties had no intent to circumvent the final judgment rule.

In *Crowder,* the plaintiffs dismissed several defendants, who had yet to enter an appearance in the matter, in order to obtain a final judgment and perfect their appeal. *Id.* at 644, 933 A.2d 905. We held that,

> [b]ecause it is clear that appellants did not voluntarily dismiss the various defendants in order to circumvent the final judgment rule, secure an advisory opinion, and re-file the same claims against the voluntarily dismissed defendants at a later date, we conclude that the court's September 26, 2006, orders of dismissal constitute final, appealable judgments.

*Id.* at 645, 933 A.2d 905.

██ Appellees argue that, unlike the dismissed defendants in *Crowder,* they would suffer prejudice from a retroactive entry of final judgment because, pursuant to Md. Rule 8–202(e), they would be prevented from filing cross appeals against Hall and Den–El in that the Rule required the cross appeals to have been filed within ten days of the filing of appellants' appeal.[5] Appellees assert that they did not file

---

5. Appellees also argue that we *suggested* in *Crowder* that our decision was based, *inter alia,* on the fact that the voluntary dismissals had been

their cross appeals within ten days of appellants' appeal because such a filing would have been premature and "there was no point to filing."[6]

Appellees' attempt to distinguish *Crowder* is unpersuasive. They do not contend, nor does the record indicate, that appellants, in violation of our holding in *Crowder*, were attempting in any way to circumvent the final judgment rule, secure an advisory opinion or re-file the same claims against Hall or Den–El. Furthermore, nothing prevented appellees from filing cross appeals against Hall and Den–El within ten days of appellants' appeal. If appellees believed that the appeals were premature, they could have timely filed their cross appeals and simultaneously requested dismissals.[7]

The objective of requiring that an appeal be from a final judgment is to avoid piecemeal appeals which are burdensome on the judicial system and create financial hardship for litigants. There is no question that the Motions to Enforce Settlement Agreement, to Vacate the Settlement Agreement

---

filed before the trial court entered its dismissal orders as to the remaining defendants, *id.* at 641, 933 A.2d 905, whereas here, the voluntary dismissals occurred after the trial court granted summary judgment. Appellees' argument is unpersuasive. Appellees provide no further authority to support their assertion, nor do they address the distinction or draw a parallel between the dismissal orders entered in *Crowder* and the order for summary judgment entered in the case *sub judice;* consequently, we decline to address this contention any further.

6. Appellees also contend that the belated dismissal of Hall and Den–El "had the effect of causing certain documents that were previously immaterial ... to become material, so that they have to be included in an Appendix to this Brief." Appellants, however, correctly point out that this particular *prejudice* can be cured by imposing on appellants the cost of printing these additional documents. *See Joseph v. Bozzuto Mgmt. Co.,* 173 Md.App. 305, 348, 918 A.2d 1230 (2007) ("[W]e deny the motion to dismiss the appeal, but we shall impose on the appellant the additional costs of reimbursing both appellees for their expenses in printing the appendices to their briefs.").

7. As a practical matter, the entirety of appellees' argument on the final judgment issue is not at issue because, as explained *infra,* we are affirming the grant of summary judgment and, as a consequence, there is no liability for which appellees could seek indemnification in a cross claim.

and in Opposition to Motion to Vacate the Settlement Agreement are now all resolved. There is no other basis upon which P & O and the MPA can assert that the instant appeal is not from a final judgment and we see no valid basis which would preclude our exercise of discretion under 8–602(e) to enter a final judgment.[8]

## II

### Restatement (Second) of Torts § 414

■ Appellants contend that the circuit court erred in finding that MPA and P & O retained insufficient control to subject them to liability under Restatement (Second) of Torts § 414. We disagree.

The Restatement (Second) of Torts § 414 provides:

One who entrusts work to an independent contractor, but *who retains the control of any part of the work,* is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

(Emphasis added). Comment c to Restatement § 414 provides the most finely-honed explicative statement of the "control" intended in order to subject an independent contractor to liability for physical harm to others:

In order for the rule stated in this section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. *It is not enough that he [or she] has merely a general* right to order

---

8. Appellees additionally argue that the December 14, 2007 order granting summary judgment failed to comply with the "separate document" requirement under Md. Rule 2–601(a). To remand this matter to the circuit court for the simple task of preparing a "separate document" contravenes the basic principles of judicial economy and fairness and would impose an unnecessary delay and undue burden on appellants. Consequently, we decline to remand for the limited purpose and exercise our discretion under 8–202(e) to hold that appellants properly appealed from a final judgment.

the work stopped or resumed, to inspect its progress or to receive reports, *to make suggestions or recommendations* which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his [or her] methods of work, or as to operative detail. There *must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his [or her] own way.*

(Emphasis added).

 We need look no further than Comment c for the framework of our analysis, *infra,* in a determination of whether appellees were subject to the requisite control. Within that framework, we are guided ineluctably to the conclusion that appellees were not. Under Maryland law, as the circuit court iterated, liability is imposed in cases where the control is over the specific type of work being performed. *See Brady v. Ralph M. Parsons Co.,* 327 Md. 275, 283, 609 A.2d 297 (1992). The principle is intended to apply where there is retention of control over the operative detail of the work. *Parker v. Neighborhood Theatres, Inc.,* 76 Md.App. 590, 601, 547 A.2d 1080 (1988). "A determination of liability under the retention of control doctrine requires a showing that the owner 'had the right to control the details of his [contractors'] movements during his performance of the business agreed upon.'" *Id.* (citing *Cutlip v. Lucky Stores, Inc.,* 22 Md.App. 673, 678, 325 A.2d 432 (1974)). "The key element of control, or right to control, 'must exist in respect to the very thing from which the injury arose.'" *Id.* (quoting *Gallagher's Estate v. Battle,* 209 Md. 592, 602, 122 A.2d 93 (1956)).

The "thing out of which the injury arose" was the act of connecting a container to a truck at reefer row. Consequently, in order to impose liability on appellees, the critical issue is whether appellees retained sufficient control over the act of connecting shipping containers to trucks to impose liability under Restatement (Second) of Torts § 414.

## A.

## Control

The § 414 element of "control" over the work retained by appellees is at the crux of the parties' contentions and we here recount the relevant evidence adduced at the summary judgment hearing.

## i.

### *Appellants' Contentions*

Appellants assert that appellees' liability arises out of the Seagirt Agreement. The Seagirt Agreement provides, *inter alia*, that

Safety ... [is a] keynote area[ ] for any quality stevedore/terminal operator. Safety directs its attention toward preventing occurrences.

\* \* \*

P & O Ports has a long history of being on the forefront of Safety ... and our goals are based on how they relate to ... customers.

\* \* \*

[We] rigidly express[ ] and exert[ ] efforts ... to create a safe workplace.

\* \* \*

Our multifaceted safety program has 10 essential points that further support our objectives.

P & O ... is and has been the only stevedore in Baltimore to have a full time Safety Director that has no other responsibilities.

\* \* \*

[O]ur standards try to anticipate hazards and human error and control them through planning.

[T]he Safety Director [conducts periodic inspections of] continuous operations where hazards can form and cause injury and damage.

\* \* \*

Our supervisory personnel ... continuously inspect ... for hazards or unsafe acts ... and have *full authority* to correct them.

\* \* \*

When an accident occurs, the P & O ... superintendent on site is required to ... investigate ... for causation and future prevention.... The superintendent then is required to take corrective action.

\* \* \*

While zero accidents is our intent, they do periodically happen. [I]f the accident is serious ..., the Vice President, General Manager, [and] Safety Manager are notified via phone—24 hours a day. They then proceed to the terminal.
(Emphasis added).

As further indicia of appellees' control over the operations and activities over the Seagirt area, appellants point to deposition testimony of Mark Montgomery, corporate designee of P & O, who stated[9] that P & O had the authority to revoke a truck driver's right to enter Seagirt if he or she broke any terminal rules. Appellants' further assert that appellees retained control over the operations at Seagirt pursuant to (1) MPA's lease with Marine Repair that required "Marine Repair ... [to] comply with all applicable prevailing rules and regulations of MPA pertaining to its port facilities," (2) MPA's corporate designee who testified that he would have expected P & O, as operator of "day-to-day" operations at Seagirt, to investigate the accident and (3) the approval Marine Repair would be required to obtain from appellees in order to impose or approve safety rules.

---

9. All references hereinafter to testimony of witnesses represent what they said during depositions. At the hearing on the Motion for Summary Judgment on December 14, 2007, of course, no testimony of witnesses was offered. The summary judgment record, however, contains numerous affidavits, documents and extensive deposition testimony, which the parties reference in their briefs. The case having been disposed of by way of summary judgment rather than a trial on the merits, all references to documents, affidavits or statements are to submissions of counsel on the summary judgment record.

Appellants finally assert that, pursuant to the Lease Agreement, Marine Repair could not post their post-accident safety protocol without first obtaining permissions from appellees and that this limitation evidences a retention of control with regard to the very situation that caused Mr. Appiah's death. *See Welker v. Kennecott Copper Co.*, 1 Ariz.App. 395, 403 P.2d 330, 341 (1965) (evidence of precautions taken after an accident tends to show right of control over the safety program).

### ii.

### *Appellees' Contentions*

Appellees counter, setting forth Montgomery's deposition testimony that, although he conceded that appellees could revoke a truck driver's right to enter Seagirt, this authority was very limited in scope:

Q. Suppose a truck driver is operating at clearly excessive and dangerous rates of speed in the Reefer Row area and you are made aware of that.

A. What would happen is—

Q. Are you suggesting you have no responsibility for that?

A. No. What would happen is typically—that has occurred. A reefer mechanic, one of the companies may call and complain that trucking company X, Y, Z has been speeding in the area. We will send a marine letter to that trucking company about speeding.

Q. Suppose it happens again.

A. Then we ban them.

Q. So you do have control over truckers' operations in Reefer Row?

A. At the direction of the reefer mechanic to keep their people safe, they would come to us and say these folks are speeding, send them a message and that happens. That happens.

\* \* \*

Q. Suppose one of your yard staff saw a truck driver operating very dangerously in or about Reefer Row and reported that to you. Same effect, right?

A. If one of our staff saw somebody speeding in any part of the facility, then we would send that truck driver a warning.

Q. And if he did it again, he would be barred, right?

A. He would be banned potentially. Depending.

Q. So if you received—so I guess the bottom line is if you received information from let's say Marine Repair about unsafe trucking actions, you would take action to correct that?

A. We would—if we got communications from Marine Repair about unsafe trucking, we would issue them a letter, yes, the trucking company.

Montgomery continued, stating that, although P & O could make recommendations to Marine Repair about behavior and safety, "ultimately it is still up to [Marine Repair] to operate safely in their areas" and that "in order for [Marine Repair] to create a safe practice for their employees, they don't need a blessing from us." Furthermore, even if P & O saw a truck driver running a stop sign, P & O is not "able to go in to one of the reefer vendors and tell them to stop doing something [and] that it's within their control. They are going to tell me to bug off." Montgomery recounted an instance when P & O saw a Marine Repair employee coming off a vessel without the appropriate Personal Protective Equipment (PPE). P & O attempted to counsel the man about the value of the PPE, but the man refused the advice and stated, "I don't work for you."

Appellees further argue that they had no control or authority over Marine Repair's operations and cite the deposition testimony of Shawn Olshefski, Marine Repair's corporate designee, to the effect that Marine Repair worked independently:

Q. Okay, Now, within the reefer row area, is there any other entity that has any say in how Marine Repair conducts its business in that area?

A. Can you rephrase the question?

Q. Yeah. When Marine Repair is performing its services in the reefer row area, is there any other company that's supervising the work of Marine Repair?

A. No.

Q. Is there any other company when Marine Repair is doing its business in the reefer row area that dictates to Marine Repair how that work should be done?

A. The work itself?

Q. Yes.

A. No, ma'am.

Olshefski further conceded that, once P & O drops off a container in the reefer area, P & O is "out of the picture" and Marine Repair takes over all of the work.

Additionally, according to deposition testimony of David Thomas, corporate designee of MPA, "The vendor has responsibility over his safety program, not the MPA," and although MPA may enact rules as to traffic flow and "general things," they do not control any "specific[s] as to how they operate ... [because] we are not the expert." Furthermore, Thomas stated that "if [P & O] had discussions with Marine Repair about their specific operations, Marine Repair would tell him ... it's none of your business."

Finally, in response to appellants' contention that they could not post signs without approval, appellees posit that, although approval was required to post signs, such a restriction was general and not specifically confined to safety measures. The relevant lease provision that restricted signage stated:

No signs or other *advertising matter*, symbols, canopies or awnings ("Advertising Matter") shall be attached to or painted on or within the Premises, including the windows and doors thereof, without the prior written consent of MPA, which consent shall not be unreasonably withheld. Marine Repair shall, at its expense, maintain such Advertis-

ing Matter as may be permitted hereunder in good condition and repair at all times.

(Emphasis added).

Appellees argue that appellants rely on a "blatant misreading" of the lease provision and transpose a strict meaning and interpretation that was never intended. Although Marine Repair was prevented from putting up signs without approval from P & O, the primary purpose of the lease provision was to restrict the posting of "advertising" material and, even if the provision prevented Marine Repair from posting a safety protocol, appellants have failed to indicate how the provision related to control over that which caused the injury-the connecting of a shipping container to a truck.

## B.

## Delegation

Appellants next argue that appellees' retention of control over safe operating procedures at Seagirt subjects MPA and P & O to liability under Restatement (Second) of Torts § 414. P & O's duty was imposed on it by the terms of its contract with MPA and MPA's duty emanated from its status as landowner and proprietor of Seagirt; therefore, the risk of non-performance of MPA's duty to its business invitee Mr. Appiah, under § 414, was non-delegable. In support of this proposition, appellants cite to *Rowley v. Mayor and City Council of Baltimore*, 305 Md. 456, 505 A.2d 494 (1986):

It is generally held that employees of an independent contractor are invitees on the property of the landowner. The duty of a landowner to an invitee is often referred to as "non-delegable." That is something of a misnomer, as the owner is free to delegate the duty of performance to another, but he cannot thereby avoid or delegate the risk of non-performance of the duty.

[W]here one invites another to come onto premises ostensibly maintained by him, his duty to the invitee cannot be

circumscribed by the employment of an independent contractor.

*Id.* at 466, 505 A.2d 494 (internal citations omitted).

 Although appellants briefly cite to a section of the Court of Appeals' holding in *Rowley,* they make no further argument as to the relevance of the decision and they fail to take into account the applicability of the *Rowley* holding. MPA argues that, because appellants rely on § 414, the *Rowley* holding is inapposite to the case *sub judice.* In *Rowley,* the Court of Appeals further opined that

[t]he generally recognized exceptions to the rule of non-liability are collected at §§ 410–429 of the Restatement. Sections 410–415 deal with liability imposed by reason of actual fault on the part of an employer of an independent contractor. *Appellant does not suggest the City is liable upon any such theory. Rather, she relies upon a theory of vicarious liability pursuant to one or more of the principles collected in §§ 416–429.* The introductory note to that portion of the Restatement is instructive:

The rules stated in ... §§ 416–429 ... are rules of vicarious liability.... The liability imposed is closely analogous to that of a master for the negligence of his servant.

*Id.* at 462–63, 505 A.2d 494 (emphasis added).

In the case *sub judice,* appellants initially asserted § 343 as the basis for their cause of action in their complaint and first and second amended complaints; however, appellants asserted § 414 as the basis for appellees' liability in their third amended complaint and, at the hearing on the motion for summary judgment, conceded that their cause of action was under § 414 and not § 343.

THE COURT: All right. Are you abandoning your statement 343 argument?

[COUNSEL FOR APPELLEES]: We're not claiming under 343. It's 414 Your Honor.

We agree with MPA's assertion that *Rowley* is inapplicable. The non-delegation of duties discussed by the *Rowley* Court apply to duties that arise under § 343, *id.* at 497, 505 A.2d 494, which apply, as the title to § 343 states, to "Dangerous

Conditions Known To Or Discoverable By Possessor." Conversely, § 414 presumes the delegation of duties because it imposes liability only when "[o]ne who entrusts work ... retains the control of any part of the work." Presumably, one who does *not* retain control of the work is free to delegate without liability.[10]

Accordingly, any argument that MPA could not delegate their duty of care is without merit [11] and the appropriate basis for our review is under § 414.[12]

## C.

### *Wajer*

The trial court granted summary judgment to appellees and opined that appellants failed "to produce any more evidence of control by [appellees] here than was produced as to the defendants in *Wajer v. Baltimore Gas & Elec. Co.*, 157 Md. App. 228, 850 A.2d 394 (2004), in which the Court of Special Appeals affirmed the granting of summary judgment." The trial court summarized the factual backdrop in *Wajer*:

In *Wajer*, [BGE] contracted with a general contractor to construct a generator at a power plant. The general contractor subcontracted some of the electrical work to H.P.

---

10. Section 409 posits the general rule that, "[e]xcept as stated in §§ 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants."

11. In support of their contention that MPA's duties were non-delegable, appellants additionally cite to *Norris v. Ross Stores, Inc.*, 159 Md.App. 323, 859 A.2d 266 (2004). However, for the reasons discussed *supra*, we decline to further address the issue on its merits.

12. Appellants conceded that they were only proceeding pursuant to Rest. § 414 and were abandoning their theory under § 343. Pursuant to this concession, the trial court directed the hearing on the basis of § 414 and reached its determinations on that basis; however, in their briefs, appellants argue that, *inter alia*, appellees are liable to appellants pursuant to Mr. Appiah's status as a "business invitee," which arises pursuant to § 343. In light of appellants' concession, we decline to address appellants' arguments that relate to Mr. Appiah as a "business invitee" on the merits.

Foley Company, employer of the plaintiff Wajer, who alleg-
edly was exposed to asbestos during his work. A BGE
employee, Mr. Sweeney, remained at the site to supervise
the contracting work. Sweeney would instruct the general
foreman on what electric work to perform, and had the
authority to stop anyone who was not working safely. The
contract that pertained to the work of the independent
contractors at the site required that the contractor *shall*
meet with BGE's engineer before beginning work and *shall*
comply with his precautionary instructions; BGE may make
inspections of the work and the Contractor shall correct a
condition or method of operation that contravenes safe
practices or operations; and BGE may bar any of the
Contractor's employees that were acting negligently or
carelessly.

*See id.* at 241–43, 850 A.2d 394 (internal citations omitted)
(emphasis added).

In affirming the trial court's grant of summary judgment in
*Wajer,* we opined that,

[a]lthough appellants are correct that appellee retained
some measure of control, the type of control is not that
contemplated by § 414. Under the General Contract's safe-
ty provisions, appellee did not have the "right to control the
details of [the contractors] movements during [their] per-
formance of the business agreed upon." The safety provi-
sions were a practical coordination of safety efforts and they
only reserved the right for appellee to hedge or alter the
contractor's performance as it related to safety. *Appellee*
*could not dictate in detail which procedures or methods the*
*contractors instituted but could only request that an unsafe*
*condition be changed or discontinued.* The operative detail
concerning what and how products were to be applied
during construction remained in the control of the indepen-
dent contractors.

*Id.* at 243, 850 A.2d 394 (emphasis added).

In the case *sub judice,* the trial court further drew a parallel
to *Wajer,* indicating that, similar to the Seagirt Agreement, in
*Wajer,*

[t]he provisions of the General Contract which appellants point out reserved unto appellee ... did not give it the right to control operative detail or manner in which the independent contractors performed their work. *There is nothing to indicate that the independent contractors were not free to choose the methods, techniques, or sequences of the work to be performed.*

*See Id.* at 244, 850 A.2d 394 (emphasis added).

The trial court further opined that appellants failed to offer any evidence that appellees had control over the methods, techniques, or sequences of the specific work performed by Marine Repair Services or Den–El. Montgomery, P & O's corporate designee, stated that, as discussed *supra*, Marine Repair "doesn't need a blessing from us" and if he were to attempt to tell them how to conduct their business, "they are going to tell me to bug off."

The trial court asserted that, even if appellees exercised control over safety, there must be control over the methods of performing the specific injurious act for liability to attach. The court then recited our holding in *Wajer*:

Moreover, even assuming the safety provisions or other provisions of the General Contract were adequate expressions of control, appellants presented no evidence to illustrate that the right of control existed *"in respect to the very thing from which the injury arose."* There is no evidence to suggest that appellee controlled the installation of asbestos products, which appellants maintain are the source of their injury. The independent contractor agreements for [the job sites] indicate that the contractors were responsible for the supervision and labor associated with the asbestos installation and appellants have not introduced any evidence to suggest otherwise.

*Id.* at 245, 850 A.2d 394 (emphasis added).

The trial court concluded as follows:

Just as the Plaintiffs in *Wajer* offered no evidence that the Defendants retained control over the very thing that caused the injury (installing asbestos), [appellants] have offered no

evidence that [appellees] controlled the very thing which caused the injury to Mr. Appiah (connecting a container to a truck at reefer row).

Appellants argue that the trial court, in applying *Wajer*, incorrectly characterized BGE's retained authority over safety issues as greater than it was, first, by implying that *Wajer* involved only one plant (the one staffed by BGE's Mr. Sweeney) and second, by characterizing Sweeney's limited authority regarding safety issues as greater than it was. Appellants assert that the trial court, in *Wajer*, determined that "[BGE's supervisor] Sweeney . . . had the authority to stop anyone who was not working safe[ly]." However, appellants argue that the *Wajer* opinion actually stated:

[BGE] also described Sweeney as the "[s]afety man" and stated that Sweeney "had the authority to stop anybody who was doing the job unsafe." Sweeney's authority, *however, did not permit him directly to inform Wajer that he was improperly performing his job.* Instead, Sweeney would report any safety concerns to the [general contractor's] general foreman and . . . the instructions would be passed down to [the subcontractor's] foreman and then to [Wajer].

\* \* \*

*[BGE] could not dictate in detail which procedures or methods the contractors instituted* but could only *request* that an unsafe condition be changed or discontinued.

*Id.* at 233, 243, 850 A.2d 394 (emphasis added).

Appellants argue that, by allegedly misconstruing BGE's retained authority over safety issues in *Wajer* as greater than it was, the court below set the "retained authority" bar for appellees' liability too high for appellants. However, we are not persuaded by appellants' argument. The ability to recommend or impose safety requirements is one limited aspect of the overarching requirement that appellees must have retained "control over the very thing that caused the injury." Similar to *Wajer*, appellees retained *some* control over the operations at Seagirt; however, it was not the type of control contemplated by § 414. *Id.* at 244, 850 A.2d 394. Here,

appellants had to show that appellees "had the right to control the details of the [container attachment] during [their] performance of the business" activity, which they have failed to do. *Id.* at 241, 850 A.2d 394 (citing *Parker,* 76 Md.App. at 601, 547 A.2d 1080 (internal citation omitted)).[13]

Appellants additionally argue that the evidence of a post-accident consultation between Marine Repair officials and appellees concerning the approval of safety protocol, in addition to all the other evidence of control, *supra,* imposes the type of control that warrants the imposition of liability under § 414. In support of that assertion, appellants cite to *Welker,* 403 P.2d at 341, in which the Court of Appeals of Arizona applied § 414, holding:

> The court further holds that the evidence pertaining to the *consultation* between [the property owner's] manager and [the contractor's] officials *after the accident* in question *should have been admitted . . . as tending to show the right of control over the safety program.*

(Emphasis added) (internal citation omitted).

Contrary to appellants' assertion, there was far more evidence of control in *Welker* than in the case *sub judice* that justified the imposition of liability.

> Under this contract, no important employee could be employed without [the owner's] approval, the salaries to be paid to all key employees were subject to [the owner's] approval, [the owner] could discharge any employee on the job, and no drawing detailing how the work was to be performed could be released to the field without prior approval by [the owner].
>
> * * *
>
> The argument is made that these controls were there to control cost. This is undoubtedly true, but the fallacy of the

---

**13.** Notably, when the trial court stated that "Sweeney ... had the authority to stop anyone who was not working safe[ly]," at that point, it was merely providing a summary of *Wajer.* When the trial court later *applied Wajer* to the instant case, the application comported to our holding and requirements elucidated in *Wajer.*

argument is that costs and safety are inextricably related under this contract. For instance, a sloping of the [trench] banks in question would have been a cost borne by [the owner], which additional cost might have prevented this accident. [The owner], under this contract, was in control of whether these banks would be sloped.

*Id.* at 340–41.

There are no such similar factors with respect to appellees. Considering the degree of control exercised by the owner, *Welker* is fully consistent with our holding in *Wajer* and the requirements of § 414.

"To generate a material factual dispute, the evidence adduced by the nonmoving party must be more than 'mere general allegations which do not show facts in detail and with precision.'" *Faith*, 127 Md.App. at 734, 736 A.2d 422 (quoting *Beatty*, 330 Md. at 738, 625 A.2d 1005). Appellants have provided assertions of the general responsibilities of appellees, none of which relate to the act of attaching a shipping container to a truck.

As indicated *supra*, it is not enough that appellees had the right to inspect and recommend changes. Furthermore, control must have existed "in respect to the very thing from which the injury arose" and the retention must be to such a degree "that the contractor is not entirely free to do the work in his [or her] own way." Other than appellants' contention that they were unable to post signs without approval, they provided no evidence that they were otherwise restricted or precluded from "doing work in their own way."

Appellants' argument relating to P & O's authority to revoke a truck driver's right to enter Seagirt is equally unavailing. P & O is the general operator of Seagirt and is the only entity capable of managing the flow of traffic and imposing regulations thereto. This limited "control" in no way relates to the act of connecting a shipping container to a truck.

Appellants fail to raise any dispute of material fact arising under § 414. Accordingly, the trial court did not err in

finding that appellees retained insufficient control to subject them to liability under Restatement (Second) of Torts § 414.

## D.

### Safety Protocol

Appellants next argued that a dispute of material fact exists as to whether Marine Repair had a pre-accident safety protocol in place. Appellees dispute that they had any such protocol in place and offered the testimony of one truck driver and the affidavit of another, both of whom indicated that they knew of no existing safety protocol prior to Mr. Appiah's death.[14]

Additionally, appellants refer to a letter sent to OSHA after the accident, indicating that, in response to the accident, Marine Repair "formulated and put into place" a safety protocol to be followed. Appellants assert that the factual dispute over whether a pre-accident safety protocol existed is material to whether appellees retained control over safety because (1) if Marine Repair formulated a pre-accident safety protocol, that would show that Marine Repair exercised control over safety, (2) if a pre-accident protocol was in place, that would tend to exculpate appellees by shifting blame to the workers who failed to follow the extant protocol and (3) if no pre-accident protocol was in place, the blame rests squarely on the shoulders of appellees for failing to create and enforce a protocol. Appellants assert that the issue should be submitted to a jury to resolve.

In response, appellees contend that Marine Repair had a pre-accident protocol in place and merely formalized the protocol in writing after the accident took place. In support thereof, appellees offer the testimony of Olshefski, *Marine Repair's own corporate designee*, who had authored the letter

---

14. Although both the deposition testimony and affidavit are statements under oath, they merely demonstrate that two truck drivers, out of presumably hundreds or even thousands, were unaware of the existence of a safety protocol.

to OSHA, admitted that Marine Repair *did* in fact have a safety protocol in place prior to the accident.

Q. All right. Mr. Olshefski, I'm showing you what we've marked as Exhibit 6, which appears to be a two-page letter from yourself to Mr. Moore of OSHA dated January 22nd, 2004.

A. Umh-humh.

Q. And attached to it is what's referred to in the letter as "the attached policy that has been posted in the relevant area of our operations here in Baltimore."

A. Umh-humh.

Q. Do you see that?

A. I do.

\* \* \*

Q. Okay. Now, taking a look at the attached policy, that has three items on it, doesn't it?

A. Yes.

Q. And it's entitled Safety Procedures for Reefer Pickup?

A. Yes.

Q. Okay. And I think you previously testified this was posted on your trailer?

A. Yes.

Q. Your office trailer?

A. Yes.

Q. *Do any of these three items listed on the reefer pickup procedures represent a change from what had previously been done up to the time of Mr. Appiah's accident?*

A. *No, ma'am. Other than it being in writing, no.*

Q. Okay. So looking at the first item, it says: "Drivers are to report to the Marine Repair reefer trailer. They will provide pickup card to reefer mechanic that contains booking number and container number." Okay. And so, just so understand your testimony, that procedure was the same both before and after Mr. Appiah's accident?

A. Yes, ma'am.

Q. Okay. The second item is: "Drivers are not permitted to leave the reefer trailer until mechanic releases unit by stamping his or her pickup card. At no time will this procedure be compromised."

* * *

Q. And is that procedure—*was that procedure a new procedure after Mr. Appiah's accident, or did that proceed [sic] exist before his accident?*

A. *It existed, but it wasn't in writing.*

(Emphasis added).

The trial court determined that,

there is some factual dispute as to whether ... Marine Repair ... had a standard safety protocol for connecting trucks to containers, [however this] dispute [is] not relevant to whether [appellees] exercised control, and thus [is] not [a] material fact[ ] for purposes of summary judgment.

 The trial court's determination was legally correct. Whether Marine Repair had an established protocol prior to the accident had little to do with whether appellees retained and exercised control over the connecting of shipping containers to trucks. Notwithstanding the fact that Marine Repairs' *own corporate designee* admitted that Marine Repair had a safety protocol in place prior to Mr. Appiah's death, the examples that appellants only offered to establish that appellees retained control over the safety of operations at Seagirt, such as responsibilities for stop signs, speeding and post-accident investigations, were non specific as to the right to direct the performance of the duties of Marine Repair's employees. Appellants provided no sworn testimony or instances whereby P & O dictated to Marine Repair how to conduct its operations and appellants have failed to establish any nexus between the issue of the safety protocol and the requisite "control" necessary to impose liability under § 414. Appellants' general allegations regarding the relevancy of the safety protocol are insufficient, without more, to establish a material factual dispute. *See Faith,* 127 Md.App. at 734, 736 A.2d 422 (quoting *Beatty,* 330 Md. at 738, 625 A.2d 1005) ("To generate

a material factual dispute, the evidence adduced by the non-moving party must be more than 'mere general allegations which do not show facts in detail and with precision.' ").

## E.

### Entrustment

Appellees contend that, in order to be liable under § 414, one must (1) "entrust[ ] work to an independent contractor" and (2) "retain[ ] the control of any part of the work." Restatement § 414. Other than the Lease Agreement, neither MPA nor P & O were in a contractual relationship with Marine Repair and, therefore, there could not have been an "independent contractor" relationship for which they could have entrusted any type of work;[15] consequently, there could be no liability arising out of Restatement § 414. In support of their proposition, appellees cite to *Peters v. Haymarket Leasing, Inc.*, 64 Mass.App.Ct. 767, 835 N.E.2d 628 (2005), in which a pedestrian, injured by a cab driver at Boston's Logan Airport, sued the Massachusetts Port Administration under several theories, including § 414 liability. The court squarely rejected the claim, stating:

> In our view, the plaintiffs claims under these theories fail, if for no other reason, because there is no evidence that [the cab driver] was in fact the authority's contractor, independent or otherwise. The status of contractor ordinarily assumes the existence of a contract.... Here, however, there has been no showing that the authority engaged in a contractual relationship of any kind with [the cab driver], much less one that would impose derivative liability under the principles of the Restatement (Second) of Torts.

> We assume for present purposes that the authority, desirous of getting people into and out of the airport, realizes a benefit from the availability of a class, *i.e.*, taxi drivers, that conducts operations at that location. We acknowledge also

---

**15.** P & O was not even awarded their contract with MPA until approximately eight months after Marine Repair started working at Seagirt.

that the authority exercises a modicum of control over those drivers by means of the taxi pool procedure. These factors fall considerably short of creating a contractual relationship between [the cab driver] and the authority.... In the absence of a status on the part of [the cab driver] as contractor (§ 428) or independent contractor (§ 414), the evidence was insufficient to support the plaintiffs claims under those sections.

*Id.* at 638–39.

We review "only the grounds upon which the trial court relied in granting summary judgment." *See Property & Casualty Ins. Guar. Corp. v. Yanni*, 397 Md. 474, 480–81, 919 A.2d 1 (2007) (quoting *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 450, 910 A.2d 1072 (2006)). As we indicated *supra*, the trial court granted summary judgment to appellees on the basis that appellants offered no evidence that appellees *controlled* the very thing which caused injury to Mr. Appiah. The trial court did not base its decision on the theory of an entrustment, *vel non*, arising out of an independent contractor relationship between the parties. We, therefore, decline to address the issue of entrustment on its merits.

## III

### STATUTE OF LIMITATIONS[16]

Appellees contend that, as an alternative ground for affirming the trial court's grant of summary judgment, appellants' third amended complaint is time-barred because it asserted new facts that did not "relate back" to the filing of the original complaint.

---

**16.** Although we affirm the circuit court's grant of summary judgment in favor of appellees, we shall parenthetically comment upon the procedural posture of the proceedings when the court declared the issues of whether appellants' claims were barred by limitations because we believe our consideration of the issue to be instructive to the bar and bench and of interest to the public.

The accident occurred on September 30, 2003 and appellants filed their initial complaints well within the three-year statutory period. *See* C.J. § 5–101. Appellants' third amended complaint, however, was not filed until October 26, 2007, over four years after the accident; consequently, the question of whether the third amended complaint was filed after the statute of limitations turns on whether the third amended complaint relates back to the filing of the original complaint. This is a pure question of law that can only be resolved by the court. *Walls v. Bank of Glen Burnie*, 135 Md.App. 229, 240, 762 A.2d 151 (2000).

We expounded upon the doctrine of "relation back" in *Priddy v. Jones*, 81 Md.App. 164, 169–170, 567 A.2d 154 (1989), in which we held:

> Where the operative factual situation set out in a timely filed preceding declaration remains essentially the same after amendment, the doctrine of relation back may be applied to bring the amended declaration within the limitations period. This is so even if a different cause of action is pled in a subsequent declaration. The Court of Appeals in *Crowe* presented the modern view: "so long as the operative factual situation remains essentially the same, no new cause of action is stated by a declaration framed in a new theory or involving different legal principles." (citations omitted).
>
> In other words, merely changing the legal theory does not constitute a new and different cause of action for purposes of the statute of limitations; the material operative facts, not the legal theory, determine the cause of action.

*Id.* at 169–70, 567 A.2d 154 (internal citations omitted). Notably, in *Crowe v. Houseworth*, 272 Md. 481, 485, 325 A.2d 592 (1974), the Court of Appeals adopted the view expressed by Justice Holmes in *New York Central & H.R.R. Co. v. Kinney*, 260 U.S. 340, 346, 43 S.Ct. 122, 67 L.Ed. 294 (1922):

> [W]hen a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of

limitations do not exist, and we are of the opinion that a liberal rule should be applied.

## A.

### *Parties' Contentions*

Appellees assert that, in appellants' first three iterations of their complaint, the general basis of their argument for imposing liability on MPA and P & O was under Restatement (Second) of Torts § 343. Appellants argued that MPA was liable as *owner of land* and liability for the unsafe conditions therein and that P & O was liable because it was a *lessee*[17] of Seagirt and failed to "establish safe procedures for the actions" of the truck drivers and activities performed at Seagirt.[18] However, according to appellees, in appellants' third amended complaint, appellants introduced new operative facts and changed the legal theory under which they believed appellees were liable. Specifically, appellants alleged that MPA, instead of being liable for a dangerous condition as owner of the land, was liable because it *undertook an active role in operations* of private entities who performed work at Seagirt and not because of any dangerous or defective condition on the land (the "control" element of Restatement Torts, § 414). Furthermore, appellants allege that P & O, instead of liability arising from its status as a lessee of the land, was liable pursuant to the Seagirt Agreement with MPA.

■■■ A change in "operative facts" or alleged "specific conduct" renders a complaint time-barred as a matter of law. *See Kirgan v. Parks*, 60 Md.App. 1, 18, 478 A.2d 713 (1984) (Amended Complaint held to be time-barred where there were "substantial differences in [the factual] allegations [in the amended complaint] as to breach of duty."); *see also Priddy*, 81 Md.App. at 170, 567 A.2d 154 (Amended complaint did not

---

**17.** As discussed *supra*, P & O was conducting general operations of Seagirt pursuant to its contract w/ MPA and was *not* a lessee of the property.

**18.** P & O characterizes this as the "Safe Workplace Doctrine."

relate back to prior version and was therefore time-barred, where the change between the operative facts in the original complaint (plaintiff slipped on foreign matter on the floor) and the facts in the amended complaint [the floor was inherently slippery] was substantial.) Appellees further cite to *Chambers v. Seghetti,* 107 Md.App. 536, 668 A.2d 1006 (1995), in which we held that an amended complaint claiming negligent entrustment filed after the plaintiff filed complaint alleging negligent operation of an automobile and filed more than three years after the accident involved "different operative facts" than mere negligence. *Id.* at 539–40, 668 A.2d 1006.

Appellants, for their part, contend that a proper application of the foregoing principles of *Crowe* and *Priddy,* discussed *supra,* indicate that their suit is not time-barred because the only change was the legal theory under which they asserted liability of appellees and that the operative facts were unchanged. Appellants postulate that their original complaint alleged, *inter alia,*

13. That at the time of the wrongs alleged, that *[P & O]* as of September 30, 2003, ... *controlled the aforementioned property on which [Mr. Appiah], was struck and injured,* resulting in his death on October 3,2003.

14. That [P & O] *had the duty and responsibility to make certain that the operations being performed on those premises that led to the injury and death of [Mr. Appiah], were safe,* and complied with all safety standards applicable to such tasks.

15. That [appellants] aver, that *[P & O] was negligent in failing to make certain that the operations* conducted on their leased premises *were safe,* and in particular failed to supervise the actions of ... Hall, in *failing to establish safe procedures for the actions being performed by ... Hall,* and such failure resulted in the injury and death of the deceased, [Mr. Appiah], and [P & O] was otherwise careless, reckless and negligent.

(Emphasis added).

The focus of the original complaint alleged that appellees controlled the property and failed in their performance of

safety responsibilities.[19] Appellants contend that, as discussed *supra*, these are the same basic fundamental operative facts as their third amended complaint and all that was changed was the legal theory under which they were proceeding-from Restatement Torts § 343 to Restatement Torts § 414.

## B.

### *Trial Court's Ruling*

The trial court ruled that appellants "have failed to offer any evidence that [appellees] had any control over the methods, techniques, or sequences of the specific work performed [by Hall or Mr. Appiah]" and that appellants "have offered no evidence that [appellants] controlled the very thing which caused the injury to Mr. Appiah." The trial court then concluded that, "[b]ased on this ruling, the question of whether [appellants'] Third Amended Complaint is time-barred is moot."

"A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Attorney Gen. v. Anne Arundel County School Bus Contractors Ass'n, Inc.*, 286 Md. 324, 327, 407 A.2d 749 (1979) (citations omitted). The court was correct that its ruling rendered the limitations issue moot.[20] In other words, appellees, having prevailed on the merits, had no further reason to pursue their claim that appellant's suit was time barred. Appellants, for their part, in clearing the hurdle of limitations without benefit of a legal determination, prevailed as to the issue declared to be moot. To be sure, the

---

19. Similar allegations were made against MPA in the original complaint.

20. While, technically, the circuit court was correct in that its ruling rendered the limitations issue moot, whether an issue is moot typically is raised in the context of separate proceedings, the prior proceeding disposing of or rendering no longer extant the controversy asserted in the subsequent proceeding.

analysis as to the merits of appellants' claims employed by the court was legally sound and articulated with unquestionable proficiency. But, while it is true that a controversy no longer existed, the court's decision does not comport procedurally with the objective of interposing limitations because a determination as to whether a party's suit is time-barred is a preliminary determination that necessarily should be ascertained prior to any proceedings on the merits. See C.J. 5–101. "Compliance with the period of limitations [in a wrongful death action] is a condition precedent to the right to maintain that action." *Slate v. Zitomer*, 275 Md. 534, 542, 341 A.2d 789 (1975) (citations omitted). In other words, the court put the proverbial cart before the horse.

Appellants argue that, although the trial court did not rule on the question of limitations, "If the alternative ground [for summary judgment] is one upon which the circuit court would have had no discretion to deny summary judgment, summary judgment may be granted for a reason not relied upon by the trial court." *Ragin v. Porter Hayden Co.*, 133 Md.App. 116, 134, 754 A.2d 503 (2000). *See Lovell Land, Inc. v. State Highway Admin.*, 180 Md.App. 725, 746, 952 A.2d 414 (2008) (citing *Vogel v. Touhey*, 151 Md.App. 682, 706, 828 A.2d 268 (2003)) ("Ordinarily, appellate courts review the grant of summary judgment only on the grounds relied upon by the trial court, but if the alternative ground is one upon which the circuit court would have no discretion to deny, summary judgment may be granted for a reason not relied upon by the trial court."). It is only when "a motion for summary judgment is based upon a pure issue of law that could not be properly submitted to a trier of fact, that we will affirm on an alternative ground." *Presbyterian Univ. Hosp. v. Wilson*, 99 Md.App. 305, 313–14, 637 A.2d 486 (1994), *aff'd*, 337 Md. 541, 654 A.2d 1324 (1995).

Adopting our pronouncement in *Lovell Land, Inc.*, "[h]ere, there is no need for this Court to declare that the trial court would have no discretion to deny summary judgment because

we are affirming the grounds relied upon by the trial court." [21]

## JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.

## COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.

### APPENDIX

---

21. The preliminary determination of whether the instant controversy is time barred had been thoroughly briefed and argued before the trial court, as evident from our outline under section III A, *supra*, in which we set forth the parties submissions before the court on that issue. The issue, to be sure, was ripe for adjudication. Notwithstanding the fact that the submission of evidence and argument of counsel on the merits of appellant's claims and their interposition of limitations as a bar to appellants' action were offered simultaneously, appellees were entitled, preliminarily, to a ruling on their Motion to Dismiss asserting limitations. Addressing preliminary motions before considering the merits of a controversy facilitates the orderly dispensation of issues and avoids potentially incongruous results. For instance, in the case, *sub judice*, assuming, *arguendo*, that, the circuit court, having ruled that appellees were not liable because of lack of control over the independent contractors, appellants appealed and we determined the court's ruling was in error. A remand for the purpose of addressing a preliminary matter would be counterproductive to the goal of achieving judicial economy. The preferable practice is to address preliminary matters at the outset.